**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**GALVESTON DIVISION**

| | | |
|---|---|---|
| CHRISTOPHER MCGINNIS,<br>INDIVIDUALLY, AND BY<br>NEXT FRIEND, BUFFY MCGINNIS, | § § § § | |
| Plaintiff, | § § | |
| v. | § § | |
| UNION PACIFIC RAILROAD COMPANY, | § § | CIVIL ACTION NO.  3:07-cv-00032 |
| Defendant and Third-Party Plaintiff, | § § § | |
| v. | § § | JURY REQUESTED |
| LIBERTY MUTUAL FIRE INSURANCE<br>COMPANY AND CERTAIN<br>UNDERWRITERS of LLOYD'S, LONDON,<br>SUBSCRIBING TO POLICY NUMBER<br>576/UF7273700, | § § § § § § | |
| Third-Party Defendants. | § § | |

**INTERVENOR METROPOLITAN TRANSIT AUTHORITY OF HARRIS**
**COUNTY, TEXAS' COMPLAINT IN INTERVENTION**

Plaintiff Christopher McGinnis, individually, and by Next Friend, Buffy McGinnis, has

filed a complaint against Defendant and Third-Party Plaintiff Union Pacific Railroad Company

("Union Pacific"). On March 23, 2007, Union Pacific filed its Original Answer. Defendant and

Third-Party Plaintiff Union Pacific then filed their Third-Party Complaint, on March 29, 2007,

complaining of Third-Party Defendants Liberty Mutual Fire Insurance Company ("Liberty

Mutual") and Certain Underwriters of Lloyd's subscribing to Policy Number 576/UF7273700

("Lloyd's").  Intervenor Metropolitan Transit Authority of Harris County, Texas ("METRO")

files this, its Intervention complaining of Third-Party Defendants Liberty Mutual and Certain

Underwriters of Lloyd's subscribing to Policy Number 576/UF7273700 ("Lloyd's") and for causes of action alleges as follows.

## I.
## THE PARTIES

1.     Intervenor Metropolitan Transit Authority of Harris County, Texas is a metropolitan rapid transit authority existing under the laws of the State of Texas, whose principal place of business is located in Houston, Harris County, Texas.

2.     Third-Party Defendant Liberty Mutual is a licensed foreign insurer organized and existing under the laws of the State of Wisconsin, whose principal place of business is Wausau, Wisconsin.  Liberty Mutual may be served with process by serving its registered agent, C T Corporation System, located at 350 North St Paul Street, Dallas, Texas 75201, under Texas Insurance Code § 804.103(b).

3.     Third-Party Defendants Lloyd's are those certain Lloyd's Syndicates Nos. 609, 1861, 2020, 1221, 1009, 1003, 2003, and 1900 subscribing individually and severally to Policy No. 576/UF7273700, which syndicates are eligible surplus lines insurers in the State of Texas. Lloyd's may be served with process under Texas Insurance Code § 804.106 by serving the Office of the Secretary of State of Texas, 1019 Brazos Street, Austin, Texas 78701.  The Secretary of State can serve Lloyd's by forwarding the citation to Mendes & Mount, 750 Seventh Avenue, New York, New York 10019-6829.

## II.
## JURISDICTION AND VENUE

4.     Jurisdiction is proper under the Federal Employers' Liability Act ("FELA"), pursuant to 45 U.S.C. § 51 et seq.

5.      Venue is proper in this matter pursuant to 28 U.S.C. § 1391 because METRO, Liberty Mutual, and Lloyd's all reside in and have systematic contacts within the Southern District of Texas and because some or all of the events made the basis of this suit occurred in the Southern District of Texas.

### III.
### FACTUAL BACKGROUND

A.      **The METRORail Construction Project and The Lease Between METRO and Union Pacific.**

6.      In 2001, METRO began construction of a light rail transportation system in Houston, Harris County, Texas (the "METRORail Construction Project"). The initial phase of the METRORail Construction Project included the construction of a 7.5 mile light rail system with 16 stations; downtown street improvements; a Transit Administration building; Park and Ride lots, a test track; a rail operations building; and the design, manufacture, assembly, testing and acceptance of 18 light rail vehicles ("LRVs"). Siemens' contract was one of seven major contracts for the construction of the METRORail system. Siemens was the Vehicle and Systems Contractor. METRO contracted with Siemens Transportation Systems ("Siemens") for the METRORail Construction Project on a "ready to go" turnkey basis. Under the turnkey contract, Siemens was responsible for virtually all aspects of the project related to the vehicles and systems, including the track, the LRVs, fare collection, catenary, sub-stations, signaling, and communications.

7.      In particular, the installation of the 18 LRVs required the testing of each of the LRVs separately prior to METRO's final acceptance of the vehicle for use in METRO's operation of the Light Rail system. The testing, or "burning-in," process, also referred to as

commissioning, required the use of a test track suitable for this purpose. In addition, as a part of the installation and commissioning of the LRVs, Siemens also provided METRO with LRV operator training and supervision. Thus, the use of a test track for the testing and burn-in of METRO's LRVs was well-known and understood to be an integral part of the overall METRORail Construction Project.

8.     In August of 2001, in connection with the METRORail Construction Project, Union Pacific and METRO entered into a five year lease of premises (the "Lease"). Under the Lease, METRO leased certain real property (the "Premises") from Union Pacific to construct, maintain and operate a test track for the purpose of testing, or "burning-in," METRO's new fleet of LRVs to be used in the operation of METRO's Light Rail System.

9.     The Premises leased to METRO were located at, on and near the railroad right of way owned by Union Pacific on which it operated two active rail lines. The use of the Premises by METRO, in particular the testing of its LRVs, created an increased risk of liability for Union Pacific arising out of or in connection with accidents that might occur from such use. Union Pacific therefore agreed to lease the Premises to METRO on the condition that METRO adequately protect Union Pacific from the liability risks inherent in METRO's intended use of the Premises. Accordingly, the Lease provided that METRO would protect Union Pacific from this increased risk of liability by obligating METRO to (i) procure and maintain certain insurance at METRO's sole cost and expense and (ii) indemnify Union Pacific.

10.     In particular, METRO promised to procure certain insurance in the form and amounts requested by Union Pacific. Specifically, METRO was obligated to procure railroad protective liability insurance, naming Union Pacific as the insured, with certain coverage limits, on a broad form coverage for "Physical Damage to Property (ISO Form CG 00 35 07 98 or

equivalent)". METRO was also obligated to procure and maintain commercial general liability insurance, containing broad form contractual liability with specific coverage limits, on a post 1998 ISO or equivalent form. METRO also agreed these policies would include certain specific endorsements that broadened coverage in favor of Union Pacific, including removal of the railroad exclusion and removal of the FELA exclusion. Finally, the Lease required that METRO's umbrella and excess insurance policies would "follow form" and afford no less coverage than the primary underlying policies.

11.    In addition to obtaining and maintaining insurance, METRO also agreed and promised to indemnify, defend, and hold Union Pacific harmless from any losses incurred by Union Pacific arising from or related to (i) any use of the Premises by METRO or any invitee or licensee of METRO, (ii) any act or omission of METRO, its officers, agents, employees, licensees or invitees, and (iii) any breach of the Lease by METRO. The losses that METRO agreed to indemnify included "any loss, damage (including, without limitation, punitive or consequential damages), injury, liability, claim, demand, cost or expense (including without limitation, attorney's fees and court costs), fine or penalty" that were "incurred by any person (including, without limitation, [Union Pacific], [METRO], or any employee of [Union Pacific] or [METRO]) and arising from or related to (i) any use of the Premises by [METRO] or any invitee or licensee of [METRO] (ii) any act or omission of [METRO], its officers, agents, employees, licensees, or invitees, or (iii) any breach of this Lease by [METRO]." METRO further agreed that the indemnity applied "to the greatest extent allowed by Texas law, regardless of any negligence, misconduct or strict liability" of Union Pacific, except that the indemnity would not apply where the loss was caused by the "sole, active and direct negligence" of Union Pacific, its affiliates, officers, agents, or employees.

**B.**     **The METRORail Owner Controlled Insurance Program.**

12.     As the METRORail Construction Project created a potentially severe risk of loss arising out of the work and operations involved in the many project activities, METRO undertook a transfer of the risk of loss through a coordinated program of insurance purchased from Liberty Mutual, Lloyds and other insurers.  This consolidated approach to risk management is commonly known as an "Owner Controlled Insurance Program" ("OCIP") or "Wrap-Up" insurance.   In a traditional arrangement, the various architects, engineers, consultants, contractors, subcontractors, project managers and owners will all obtain their own insurance covering their work on a project.  In an OCIP/Wrap Up, the owner of the construction project purchases insurance policies through a comprehensive program covering all project participants. As a comprehensive plan controlled primarily by one insurer, an OCIP/Wrap Up provides broad and uniform coverage for a project at a considerable savings over separate and piecemeal coverage by each of the project participants.   An OCIP/Wrap Up typically includes workers' compensation, employer's liability, builder's risk, primary and excess liability, railroad protective liability, and environmental liability coverage – but does not include commercial auto liability coverage.

13.     In particular, METRO sought and obtained from Liberty Mutual and Lloyd's consolidated risk financing for the METRORail Construction Project through the creation of a single source of funds to pay for project losses, regardless of who caused them.  METRO as the owner of the METRORail Construction Project designated Willis as its broker for obtaining the insurance necessary for the entire project, covering each general contractor and subcontractor. Accordingly, METRO obtained and/or entered into several insurance policies and insurance related agreements that together formed the METRORail Owner Controlled Insurance Program

("METRORail OCIP").   Moreover, METRO obtained, under the METRORail OCIP Program,

insurance required to fulfill METRO's insurance and indemnity obligations under the Lease.

METRO relied on the METRORail OCIP Program to satisfy its contractual insurance and

indemnity obligations to Union Pacific.

**C.     The Liberty Mutual Railroad Protective Liability Policy.**

14.     On Union Pacific's behalf, METRO purchased and Liberty Mutual issued

Railroad Protective Liability Policy No. TE2-691-004173-031, effective 3/14/2001 to 9/14/2004,

to Union Pacific as the Named Insured (the "RPL Policy").   The RPL Policy insured Union

Pacific's legal obligation to pay for bodily injury and property damage arising out of acts or

omissions at the job location that were related to or were in connection with the work or

operations performed by METRO described in the Declarations of the RPL Policy.   The RPL

Policy Declarations identified the "Job Location" as "Houston, Texas" and described the work or

operations as:   "Two mile test track built 25 feet from existing track.   METRO will be laying

track across an existing bridge that runs over Union Pacific tracks (no bridge construction)."

15.     In applying for the RPL Policy, METRO provided the information requested by

Liberty Mutual necessary to identify the liability risks to be insured.   The information provided

by METRO included, but was not limited to, the Lease and a Questionnaire describing the work

and operations, both of which clearly disclosed that METRO's testing of its LRVs was among

the risks being insured.   On this basis, Liberty Mutual agreed to issue the RPL Policy based on

the specific knowledge disclosed in the Lease and the application that the risks to be insured

under the policy included METRO's testing of its LRVs on tracks within 25 feet of Union

Pacific's existing track for the term of the RPL Policy.   Further, Liberty Mutual calculated and

charged an estimated advance premium for the RPL Policy based on the Classifications Code

No. 4007 "Operations – Railroad" prior to issuing the policy. Further, the RPL Policy also allows Liberty Mutual to charge an additional premium based on an audit of the actual premium basis determined after the expiration of the policy.

**D.      The Liberty Mutual CGL Policy.**

16.      METRO also purchased and Liberty Mutual issued a Commercial General Liability policy, Policy No. RG2-691-004173-011, effective 3/14/2001 to 9/14/2004, to METRO as the First Named Insured (the "CGL Policy"). The CGL Policy insured METRO's legal obligation to pay for bodily injury and property damage under an "Insured Contract," which is defined as a contract or agreement pertaining to METRO's business under which METRO assumed the tort liability of another to pay damages because of "personal injury" or "property damage" to a third person or organization, if the contract or agreement is made prior to the "personal injury" or "property damage."

17.      As with the RPL Policy, METRO provided the information requested by Liberty Mutual necessary to identify the liability risks to be insured under the CGL Policy. The information provided by METRO included, but was not limited to, the Lease, which clearly disclosed that METRO's testing of its LRVs was among the risks for which METRO agreed to indemnify Union Pacific. On this basis, Liberty Mutual agreed to issue the CGL Policy based on the specific knowledge disclosed in the Lease that METRO had assumed the tort liability of Union Pacific arising out of METRO's testing of its LRVs on tracks within 25 feet of Union Pacific's existing track for the term of the RPL Policy.

**E.      The Lloyd's Umbrella Policy.**

18.      METRO also procured from Lloyd's an umbrella policy, Lloyd's Policy Number 576/UF7273700 (the "Lloyd's Policy"), as a follow-form umbrella policy that provides coverage

excess to the coverage provided under the scheduled underlying RPL Policy and CGL Policy. The underlying insurances specifically scheduled under the Lloyd's Policy included the RPL Policy issued to Union Pacific and the CGL Policy issued to METRO.

19.     The Lloyd's Policy insured METRO's liability imposed by law or assumed under an Insured Contract to pay for bodily injury and property damage in excess of the Retained Limit specified in the policy. The Lloyd's Policy defines an "Insured Contract" as "any oral or written contract or agreement entered into by you and pertaining to your business under which you assume the tort liability of another party to pay for Bodily Injury, Property Damage, Personal Injury or Advertising Injury to a third person or organization."

20.     The Lloyd's Policy agreed to defend any claim or suit seeking damages covered by the policy that are not covered by any underlying insurance scheduled in the policy. The Lloyd's Policy defined the "Retained Limit" as " the greater of either:  (1)  The total of the applicable limits of the underlying policies listed in the Schedule of Underlying Insurance and the applicable limits of any other underlying insurance providing coverage to the Insured; or (2) The amount stated in the Declarations as Self Insured Retention as a result of any one Occurrence not covered by the underlying policies listed in the Schedule of Underlying Insurance nor by any other underlying policies listed in the Schedule of Underlying Insurance not by any other underlying insurance providing coverage to the Insured[.]"  Finally, the Lloyd's Policy provided that "[i]f such other insurance shall, for any reason, refuse or fail to defend and pay on behalf of the Insured, the Underwriters will take over, defend and pay on behalf of the Insured in accordance with the Insuring Agreements, terms and conditions of the policy as though such other policy did not exist."

F.    **The January 23, 2004 Accident and the Claims Arising out of the Accident.**

21.    Siemens delivered the first LRV to METRO in April 2003 and the installation and commissioning of these vehicles, including the training of METRO's LRV operators, began shortly thereafter. On January 23, 2004, a light rail vehicle ("LRV 115") being commissioned by Siemens and being operated by a METRO employee on the test track located on the Premises collided with a Union Pacific welding truck at crossing # 755612H, also identified as the intersection of Kirby Drive and the railroad tracks in Houston, Harris County, Texas (the "Accident").

22.    The Accident involving LRV 115 occurred during the commissioning by Siemens' pursuant to a METRORail Construction Project contract with METRO. At the time of the Accident, the work or operations pursuant to the Lease and the METRORail Construction Project had not been completed or put to its final intended use.

23.    As a result of the Accident, several persons sustained bodily injuries, including Plaintiff Christopher McGinnis, the Union Pacific driver of the welding truck, the METRO operator of LRV 115, and other METRO employees who were on LRV 115 at the time of the Accident. In addition, the Accident resulted in damage to property belonging to Union Pacific.

24.    The individuals injured in the Accident, including Plaintiff Christopher McGinnis, asserted claims for damages against Union Pacific, including several lawsuits filed by the METRO employees against Union Pacific. Union Pacific's losses or exposures to loss from the Accident arise from and/or are related to (i) the use of the Premises by METRO and/or an invitee or licensee of METRO; and (ii) the acts or omissions of METRO, its officers, agents, employees, licensees or invitees. In addition, Union Pacific's losses or exposures to losses were not caused by the sole negligence of Union Pacific, or its affiliates, officers, agents, or employees.

**G.**   **The Demands for Defense and Indemnity and the Denials of Coverage.**

25.   After the Accident, Union Pacific provided notice and tendered the claims and suits brought against it to Liberty Mutual under the RPL Policy and demanded defense and indemnity. In addition, Union Pacific tendered the claims and suits brought against it to METRO pursuant to the contractual indemnity obligation of the Lease. In turn, METRO tendered Union Pacific's demands for contractual indemnity to Liberty Mutual and demanded defense and indemnity from Liberty Mutual under the CGL Policy. Union Pacific and METRO also made appropriate demands for defense and indemnity for the claims arising out of the Accident to Lloyd's. The demands for defense and indemnity by Union Pacific and METRO have been made on several occasions subsequent to the Accident.

26.   On June 10, 2004, Liberty Mutual asserted, in a letter signed by a Senior Technical Claims Specialist, that the allegations underlying Mr. McGinnis's claim did not create a potential for coverage under the policies and, as a result, further asserted that they had no duty to defend or indemnify Union Pacific against the claim. The reason given by Liberty Mutual for the denial of coverage is its claim that the coverage provided by the RPL Policy was limited to the construction of the test track, which work had been completed at the time of the Accident. Liberty Mutual also denied contractual liability coverage to METRO for sums that METRO would or did become legally obligated to pay as damages because of bodily injury or property damage indemnified under the Lease. Lloyd's also denied all coverage to Union Pacific and METRO under the Lloyd's Policy.

**H.**   **Liberty Mutual's Extension of the Policies After the Denial of Coverage.**

27.   The original expiration date of the METRORail OCIP was September 14, 2004. In the summer of 2004, as the expiration date neared, the METRORail Construction Project was

still not substantially complete. METRO and its contractors and subcontractors were continuing with the project, including the commissioning of the LRVs. METRO therefore sought an extension of the METRORail OCIP. On July 22, 2004, Liberty Mutual was asked by Willis, METRO's broker, to "[p]lease confirm Liberty's agreement for the OCIP extension includes the Railroad Protective coverage as well. There is no construction activity, but Metro may have one vehicle tested during the 6 month time frame." The head of Liberty Mutual's National Markets/Construction Group in turn forwarded the e-mail from Liberty Mutual's lead underwriter for the METRORail OCIP for confirmation. On July 23, 2004, Liberty Mutual's lead underwriter confirmed that "[i]t will include the Railroad Protective." Thus, although on June 10, 2004 Liberty Mutual had denied any coverage for the Accident under the RPL Policy, on the claimed basis that the policy did not cover METRO's testing and burning-in of the LRVs, Liberty Mutual extended the RPL Policy because "[t]here is no construction activity, but Metro may have one vehicle tested during the 6 month time frame."

28.     In March 2005, as the METRORail OCIP was about to expire again, METRO requested a 30 day extension from Liberty Mutual of only the RPL Policy. In requesting the extension, METRO specifically informed Liberty Mutual that METRO "has to have this in place in case of any testing that would be required on the Light Rail Vehicles (LRV)." On March 14, 2005, Liberty Mutual agreed to extend the RPL Policy for thirty days, again with the knowledge that the policy extension was necessary because testing and burning-in of METRO's LRVs could occur during the extended period of coverage.

29.     These two extensions of the RPL Policy – for the express reason that the commissioning of the LRVs had not been completed, even though there was no construction activity – contradicts the coverage position taken by Liberty Mutual that the completion of the

test track had terminated all coverage under the RPL Policy. Liberty Mutual's underwriter agreed to these two extensions because the commissioning of the LRVs was a part of the METRORail Construction Project and therefore was a part of the "work" covered by the RPL Policy.

30.     Liberty Mutual extended the METRORail OCIP and the RPL Policy with actual knowledge that METRO had requested the extension because the testing and acceptance of the LRVs had not been completed and with the knowledge that the construction of the test track had been completed. Further, in extending these policies, Liberty Mutual did not take exception or otherwise inform METRO that Liberty Mutual would refuse to cover the testing and burning-in of the LRVs during the extended term of the policies, which was the reason for the extension.

**I.      Union Pacific's Settlements of the Claims Arising Out of the Accident.**

31.     Union Pacific, having been denied defense and indemnity, investigated and defended at its expense the claims and lawsuits brought by Plaintiff Christopher McGinnis and the METRO employees injured in the Accident. Union Pacific also repaired and/or replaced at its expense the railroad signal and related equipment damaged in the Accident.

32.     In addition, Union Pacific protected its own interest in minimizing the potential liability arising out of the Accident by agreeing in good faith to settlements of the claims and lawsuits brought by Plaintiff Christopher McGinnis and the METRO employees injured in the Accident on a reasonable basis and for reasonable amounts. In agreeing to these settlements after the denial of coverage, Union Pacific exercised the judgment of a prudent uninsured person in compromising and paying the claims.

## IV.
## FIRST CAUSE OF ACTION
## BREACH OF CONTRACT

33.     As set forth in paragraphs 5 through 32, which are incorporated here, the refusal

by Liberty Mutual and Lloyd's to provide coverage for Union Pacific's and METRO's liabilities

arising out of the Accident is a breach of the RPL Policy, the CGL Policy and the Lloyd's Policy

contracts of insurance.   Liberty Mutual's and Lloyd's breaches of contract have no basis under

Texas law or the policies, and results from an erroneous and/or malicious interpretation of the

respective policies by these insurers.    There currently exists no bona fide dispute about the

liability of Liberty Mutual and Lloyd's under the insurance policies providing the coverage.

Liberty Mutual and Lloyd's know or should know that the obligation to defend and indemnify

Union Pacific and/or METRO pursuant to the policies is clear, yet these insurers have failed to

honor their contractual obligations.   The RPL Policy, the CGL Policy and the Lloyd's Policy

were each intended to and did protect Union Pacific and/or METRO by providing defense and

indemnity against the liabilities arising out of or related to the Accident.

34.     The breach of the RPL Policy and the CGL Policy by Liberty Mutual, and the

breach of the Lloyd's Policy by Lloyd's, has directly and proximately caused METRO harm

because METRO agreed to indemnify Union Pacific for (i) sums that Union Pacific became

legally obligated to pay as damages because of bodily injury or property damage arising from or

related to the Accident, (ii) sums that Union Pacific paid as costs to investigate and defend the

bodily injury or property damage claims asserted against it arising from or related to the

Accident; (iii) damages to Union Pacific's property; and (iv) Union Pacific's reasonable

attorney's fees incurred in this suit.   One of the reasons METRO purchased the CGL Policy was

to comply with its indemnity obligation to Union Pacific.   Consequently, METRO is entitled to

recover its actual and consequential damages for breach of contract from Liberty Mutual and Lloyd's, for which METRO now sues.

## V.
### SECOND CAUSE OF ACTION
### DECLARATORY JUDGMENT

35.     As set forth in paragraphs 5 through 32, which are incorporated here, Liberty Mutual and Lloyd's have refused to provide coverage for any losses arising out of the Accident, despite Union Pacific's and METRO's clear demand for the same.  As such, there is uncertainty with respect to the parties' respective rights, duties, and obligations under the RPL Policy and the Lloyd's Policy.  The refusal of Liberty Mutual and Lloyd's to provide coverage to Union Pacific and/or METRO has created a real, substantial, and justiciable controversy between the parties. METRO seeks a declaratory judgment for construction of the policies, a declaration that Union Pacific's settlements with persons injured in the Accident are covered under the policies, a declaration that any indemnity METRO owes to Union Pacific based on such settlements are covered by the policies, and a declaration that Liberty Mutual and Lloyd's must indemnify Union Pacific and/or METRO for the covered losses arising out of the Accident.   A declaratory judgment by this Court pursuant to Texas Civil Practice & Remedies Code §§ 37.001-37.011, and any other applicable statute or law, would resolve the current controversy and eliminate the uncertainty that currently exists.

36.     Liberty Mutual and Lloyd's have refused to provide coverage for METRO's indemnity obligation to Union Pacific under the Lease for losses arising out of the Accident, despite METRO's clear demand for the same.  Liberty Mutual's and Lloyd's denial of coverage for the Accident under the RPL Policy, the CGL Policy, and the Lloyd's Policy has resulted in METRO's inability to comply with the indemnity provisions of the Lease.  As such, there is

uncertainty with respect to the parties' respective rights, duties, and obligations under the CGL Policy and the Lloyd's Policy.  The refusal of Liberty Mutual and Lloyd's to provide contractual liability coverage to METRO and coverage to Union Pacific has created a real, substantial, and justiciable controversy between the parties.   METRO seeks a declaratory judgment for construction of the policies, a declaration that Union Pacific's settlements with persons injured in the Accident are covered under the contractual liability provisions of the policies, and a declaration that Liberty Mutual and Lloyd's must indemnify METRO for the covered losses arising out of the Accident.  A declaratory judgment by this Court would resolve the current controversy and eliminate the uncertainty that currently exists.

## VI.
## THIRD CAUSE OF ACTION
## VIOLATIONS OF § 541.060 OF THE TEXAS INSURANCE CODE

37.     As set forth in paragraphs 5 through 32, which are incorporated here, Liberty Mutual and Lloyd's violated Texas Insurance Code § 541.060 by engaging in unfair settlement practices with respect to Union Pacific's and METRO's claim for coverage under the RPL Policy, the CGL Policy, and the Lloyd's Policy.  The unfair or deceptive acts or practices by Liberty Mutual and Lloyd's involve:

a.     misrepresenting to Union Pacific and/or METRO a material fact or policy provision relating to the coverage at issue, in violation of § 541.060(1);

b.     failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of a claim with respect to which the liability of Liberty Mutual and Lloyd's has become reasonably clear, in violation of § 541.060(2)(A);

c.     failing within a reasonable time to affirm or deny coverage of a claim to Union Pacific and/or METRO or submit a reservation of rights to Union Pacific and/or METRO, in violation of § 541.060(4); and

d.     refusing the claims submitted by Union Pacific and/or METRO without conducting a reasonable investigation with respect to the claim, in violation of § 541.060(7).

38.     The conduct of Liberty Mutual and Lloyd's in violation of the Texas Insurance Code has no basis under Texas law or the Policy, and results from the wrongful interpretation by Liberty Mutual and Lloyd's of the Policy and the refusal to perform their obligations under the policies.  There currently exists no bona fide dispute about the liability of Liberty Mutual and Lloyd's under the policies.  The obligation of Liberty Mutual and Lloyd's under the policies is clear, yet Liberty Mutual and Lloyd's have failed to attempt in good faith to effectuate a prompt and equitable payment of their obligation.

39.     The violations of Texas Insurance Code § 541.060 by Liberty Mutual and Lloyd's have caused METRO to incur damages.  METRO is entitled to recover those actual damages from Liberty Mutual and Lloyd's, plus court costs and reasonable and necessary attorney fees, pursuant to Texas Insurance Code § 541.152(a)(1).  In addition, Liberty Mutual and Lloyd's have knowingly violated the applicable provisions of Texas Insurance Code § 541.060, entitling METRO to be awarded an amount not to exceed three times the amount of actual damages, pursuant to Texas Insurance Code § 541.152(b).

## VII.
## FOURTH CAUSE OF ACTION
## VIOLATIONS OF § 541.060 OF THE TEXAS INSURANCE CODE

40.     As set forth in paragraphs 5 through 32, which are incorporated here, Liberty Mutual and Lloyd's violated Texas Insurance Code § 541.061 by engaging in unfair or deceptive acts or practices by misrepresenting the RPL Policy, the CGL Policy, and the Lloyd's Policy to Union Pacific and/or METRO.  The unfair or deceptive acts or practices by Liberty Mutual and Lloyd's involve:

   a.     making untrue statements of material fact, in violation of § 541.061(1);

-17-

    b.    failing to state material facts necessary to make other statements made not misleading, considering the circumstances under which the statements were made, in violation of § 541.061(2);

    c.    making a statement in a manner that would mislead a reasonably prudent person to a false conclusion of material facts; in violation of § 541.061(3); and

    d.    failing to disclose a matter required by law to be disclosed, in violation of § 541.061(5).

41.    The conduct of Liberty Mutual and Lloyd's in violation of the Texas Insurance Code has no basis under Texas law or the Policy, and results from the wrongful interpretation by Liberty Mutual and Lloyd's of the policies and the refusal to perform their obligations under the policies. There currently exists no bona fide dispute about the liability of Liberty Mutual and Lloyd's under the policies. The obligation of Liberty Mutual and Lloyd's under the policies is clear, yet Liberty Mutual and Lloyd's have failed to attempt in good faith to effectuate a prompt and equitable payment of their obligation.

42.    The violations of Texas Insurance Code § 541.061 by Liberty Mutual and Lloyd's have caused METRO to incur damages. METRO is entitled to recover those actual damages from Liberty Mutual and Lloyd's, plus court costs and reasonable and necessary attorney fees, pursuant to Texas Insurance Code § 541.152(a)(1). In addition, Liberty Mutual and Lloyd's have knowingly violated the applicable provisions of Texas Insurance Code § 541.061, entitling METRO to be awarded an amount not to exceed three times the amount of actual damages, pursuant to Texas Insurance Code § 541.152(b).

## VIII.
### FIFTH CAUSE OF ACTION
### VIOLATIONS OF § 541.060 OF THE TEXAS INSURANCE CODE

43.    As set forth in paragraphs 5 through 32, which are incorporated here, Liberty

Mutual and Lloyd's induced the purchase of their respective policies and received insurance premiums for worthless insurance coverage by representing that the policies would provide coverage when these insurers intended to deny coverage. Alternatively, Liberty Mutual and Lloyd's failed to disclose that they would refuse coverage under the policies for Union Pacific's and/or METRO's liabilities arising out the work and operations intended to be covered. In reasonable reliance on the representations and/or failures to disclose by Liberty Mutual and Lloyd's, the policies were purchased and premiums were paid for coverage that did not have the value represented by Liberty Mutual and Lloyd's.

44.     Liberty Mutual and Lloyd's violated Tex. Bus. & Comm. Code § 17.46 (b)(5) by representing that their insurance services had characteristics or benefits which they did not have. Union Pacific and/or METRO relied on this deceptive act or practice to its detriment and is authorized to recover damages pursuant to Tex. Ins. Code § 541.151(2).

45.     Liberty Mutual and Lloyd's violated Tex. Bus. & Comm. Code § 17.46 (b)(7) by representing that their insurance services were of a particular standard or quality when they were of another. Union Pacific and/or METRO relied on this deceptive act or practice to its detriment and is authorized to recover damages pursuant to Tex. Ins. Code § 541.151(2).

46.     Liberty Mutual and Lloyd's violated Tex. Bus. & Comm. Code § 17.46 (b)(12) by representing that their policies conferred or involved rights, remedies, or obligations which they do not have or involve. Union Pacific and/or METRO relied on this deceptive act or practice to its detriment and is authorized to recover damages pursuant to Tex. Ins. Code § 541.151(2).

47.     Liberty Mutual and Lloyd's violated Tex. Bus. & Comm. Code § 17.46 (b)(24) by failing to disclose information concerning their insurance services which was known at the time of the transaction. The failure of Liberty Mutual and Lloyd's to disclose such information was

intended to induce a transaction which would not have been entered into had the information been disclosed. Union Pacific and/or METRO relied on this deceptive act or practice to its detriment and is authorized to recover damages pursuant to Tex. Ins. Code § 541.151(2).

48.    The deceptive acts and practices described above are and were a producing cause of damages to METRO. Therefore, pursuant to Tex. Ins. Code § 541.152(a)(1), METRO is entitled to obtain the amount of actual damages, plus court costs and reasonable and necessary attorney's fees from Liberty Mutual and Lloyd's.

49.    The deceptive acts and practices described above were committed knowingly by Liberty Mutual and Lloyd's, as defined by Tex. Ins. Code § 541.002(1). Therefore, pursuant to Tex. Ins. Code § 541.152(b), METRO is entitled to an award of an additional amount not to exceed three times the amount of actual damages.

## IX.
## MUTUAL MISTAKE

50.    As set forth in paragraphs 5 through 32, which are incorporated here, METRO and Liberty Mutual had a definitive and explicit antecedent agreement as to the intended scope of the work and operations to be insured under the RPL Policy. METRO and Liberty Mutual understood and agreed prior to the issuance of the RPL Policy that the work and operations to be insured under the policy would include the testing of METRO's LRVs on the test track. This intended scope of the work and operations to be insured under the RPL Policy was understood in the same sense by both METRO and Liberty Mutual.

51.    In the alternative, if it is determined that the RPL Policy Declarations do not state the antecedent agreement of METRO and Liberty Mutual as to the intended scope of the work and operations, then any such failure to express the antecedent agreement of the parties is the

result of their mutual mistake in subsequently reducing their agreement to writing. Further, if the RPL Policy Declarations are the result of a mutual mistake, METRO seeks an equitable reformation of the RPL Policy to reflect and state the true actual antecedent agreement of the parties that the testing of METRO's LRVs on the test track was included within the scope of the work and operations intended to be covered under the policy.

## X.
## CONDITIONS PRECEDENT

52.     As set forth in paragraphs 6 through 32, which are incorporated here, METRO has fully performed its respective obligations under the RPL Policy, the CGL Policy, and the Lloyd's Policy. All conditions precedent to METRO's claims for relief have been performed or have occurred.

53.     Alternatively, METRO has complied with and performed under the essential terms and elements of the RPL Policy, the CGL Policy, and the Lloyd's Policy and any defects in performance by METRO do not prevent the parties from accomplishing the purposes of the policies. Further, Liberty Mutual and Lloyd's have not been prejudiced in that they have not been deprived of the benefit that could reasonably have been anticipated from strict compliance and full performance.

54.     Accordingly, Liberty Mutual and Lloyd's cannot avoid or deny the insurance coverage owed to METRO. Alternatively, Liberty Mutual and Lloyd's are estopped to enforce any conditions precedent or have waived the right to enforce any conditions precedent.

## XI.
## ATTORNEY'S FEES

55.     As set forth in paragraphs 5 through 32, which are incorporated here, METRO is

entitled to recover its reasonable attorney's fees from Liberty Mutual and Lloyd's for the prosecution and defense of this suit pursuant to §§ 37.001 and 38.001 of the Texas Civil Practice & Remedies Code, the Texas Insurance Code, and any other applicable law.

## XII.
## PRAYER

Accordingly, Intervenor METRO respectfully requests that Defendants Liberty Mutual Fire Insurance Company and Certain Underwriters of Lloyd's subscribing to Policy Number 576/UF7273700 be served with citation to appear and answer in this cause. METRO further requests that this Court, upon final trial, award METRO the requested declaratory relief and judgment of all actual and consequential damages resulting from the losses insured under the RPL Policy, the CGL Policy, and the Lloyd's Policy; and an additional amount for Liberty Mutual's and Lloyd's knowing violation of the Texas Insurance Code. METRO further requests that this Court award it pre-judgment and post-judgment interest at the highest rate allowed by law or contract; that METRO be granted judgment for reasonable attorney's fees pursuant to Texas Civil Practice & Remedies Code §§ 37.001 and 38.001, Texas Insurance Code § 541.152, and any other applicable statutes and laws; that METRO be granted all costs of court; and that METRO be awarded such other relief to which it may be entitled.

Respectfully submitted,

BRACEWELL & GIULIANI LLP

By: ___ */s/ Bryan S. Dumesnil*_____
Bryan S. Dumesnil
Texas State Bar No. 00793650
Southern District ID No. 20999

South Tower Pennzoil Place
711 Louisiana, Suite 2300
Houston, Texas   77002
(713) 223-2300 (Telephone)
(713) 221-1212 (Telecopier)

ATTORNEY-IN-CHARGE FOR INTERVENOR
METROPOLITAN TRANSIT AUTHORITY OF
HARRIS COUNTY, TEXAS

OF COUNSEL:

William G. Hagans
Texas State Bar No. 24055612
Southern District ID No. 695531
Bracewell & Giuliani LLP
711 Louisiana, Suite 2300
Houston, Texas   77002
(713) 223-2300 (Telephone)
(713) 221-1212 (Telecopier)

ATTORNEY FOR INTERVENOR METROPOLITAN
TRANSIT AUTHORITY OF HARRIS COUNTY, TEXAS

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Motion to Intervene forwarded by facsimile, U.S. First Class Mail, postage prepaid, and/or ECF, to the parties listed below on this 4th day of April, 2007:

George W. Gore
801 Congress, Suite 350
Houston, Texas 77002

*Attorney for Plaintiffs Christopher McGinnis,*
*Individually, and by Next Friend, Buffy*
*McGinnis*

John L. Hagan
JONES DAY
717 Texas, Suite 3300
Houston, Texas 77002
Telephone: (832) 239-3939
Facsimile: (832) 239-3600

Benton R. Bond
UNION PACIFIC RAILROAD COMPANY
808 Travis, Suite 620
Houston, Texas 77002
Telephone: (713) 220-3206
Facsimile: (713) 220-3211

Douglas W. Poole
MCLEOD, ALEXANDER, POWELL &
APFEL, P.C.
802 Rosenberg
Galveston, Texas 77550

*Attorneys for Defendant and Third-Party*
*Plaintiff UNION PACIFIC RAILROAD*
*COMPANY*

_/s/ William G. Hagans_____
William G. Hagans