IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

GALVESTON DIVISION

| | | |
|---|---|---|
| CHRISTOPHER MCGINNIS, INDIVIDUALLY, AND BY NEXT FRIEND, BUFFY MCGINNIS, | § § § § | |
| Plaintiffs, | § § | |
| VS. | § § | CIVIL ACTION NO. 3:07-CV-32 |
| UNION PACIFIC RAILROAD CO., | § § | |
| Defendant and Third-Party Plaintiff, | § § | |
| METROPOLITAN TRANSIT AUTHORITY OF HARRIS COUNTY, TEXAS, | § § § § | |
| Intervenor | § § | |
| VS. | § § | |
| LIBERTY MUTUAL FIRE INSURANCE COMPANY AND THOSE CERTAIN INDIVIDUAL UNDERWRITERS of LLOYD'S LONDON, FORMING SYNDICATE 1861 AND SYNDICATE 2003 SUBSCRIBING SEVERALLY TO POLICY NUMBER 576/UF7273700 FOR THE 2003 LLOYD'S YEAR OF ACCOUNT, | § § § § § § § § § § § | |
| Third-Party Defendants. | § | |

## <u>MEMORANDUM AND ORDER</u>

Before the Court are the Motions for Summary Judgment of Third-Party Defendants

Liberty Mutual Fire Insurance Company ("Liberty Mutual") (Docket Entry ("Doc.") No. 64) and

1

Underwriters of Lloyd's, London ("Lloyd's") (Doc. No. 66), and all objections, responses and replies thereto (respectively, Doc. Nos. 74, 76, 84 & 85; Doc. Nos. 76, 81, 87, 88 & 90). Also before the Court are the Partial Motions for Summary Judgment of Third-Party Plaintiff Union Pacific Railroad Company ("UP") (Doc. Nos. 67 & 69) and Intervenor Metropolitan Transit Authority ("Metro") (Doc. No. 65), and all objections, responses and replies thereto (respectively, Doc. Nos. 71, 77, 89 & 91; Doc. Nos. 70, 78, 86).

After reviewing the Motions, all related filings, and the relevant law, the Court finds, for the reasons discussed below, that Liberty Mutual's Motion for Summary Judgment should be granted in part and denied in part, that Lloyd's Motion for Summary Judgment should be denied, that UP's Motions for Partial Summary Judgment of UP should be granted in part and denied in part, and that Metro's Motion for Partial Summary Judgment should be granted in part and denied in part.

## I.   FACTUAL BACKGROUND

### A. Metro's Light Rail Project

In 2001, Metro began construction of a light rail transportation system in Houston, Texas. The initial phase of the light rail project included the construction of a 7.5 mile light rail system with 16 stations, downtown street improvements, a Transit Administration building, Park and Ride lots, a test track, a rail operations building, and the design, manufacture, assembly, testing and acceptance of 18 light rail vehicles ("LRVs"). Metro obtained seven major contracts for the construction of the light rail system. One of Metro's contracts for construction was with Siemens Transportation Systems ("Siemens"), the Vehicle and Systems Contractor. Metro's contract with Siemens was on a "ready to go" turnkey basis, which meant that Siemens was

2

responsible for virtually all aspects of the light rail project related to the vehicles and systems, including the track, the LRVs, fare collection, catenary, sub-stations, signaling, and communications. In particular, the "ready to go" contract made Siemens responsible for the installation of the 18 LRVs, which each required separate testing before Metro would take final acceptance for their use in its light rail transportation system. This testing, or "burning-in" process, also referred to as commissioning, necessitated Siemens' use of a suitable test track. Siemens was also required to provide Metro employees with operator training and to supervise the LRVs.

### B. Metro's Lease Agreement with Union Pacific

In order to facilitate the installation or testing by Siemens of Metro's new fleet of LRVs, Metro entered into negotiations with Union Pacific ("UP") for a five year lease agreement to construct, maintain, and operate a test track on UP's land. Because the premises Metro sought to lease for its light rail project were located in close proximity to a railroad right-of-way owned by UP, on which it operated two active rail lines, there was an increased risk that accidents might arise from Siemens' use of the property. Due to the increased risk, Metro and UP agreed to incorporate two important requirements into the lease agreement to protect UP. First, pursuant to the terms of the lease agreement, Metro was required to purchase specified insurance to protect UP from the increased risk. The agreement provides:

> [Metro] shall, at its sole costs and expense, procure and maintain during
> the life of this Agreement the following insurance coverage:
>
> A. Commercial General Liability insurance. This insurance shall contain
> broad form contractual liability with a single limit of at least $5,000,000
> each occurrence or claim and an aggregate limit of at least $10,000,000.
> Coverage must be purchased on a post 1998 ISO or equivalent form.

3

\* \* \*

B.  Railroad Protective Liability insurance naming only [UP] as the insured with a combined single limit of $2,000,000 per occurrence with a $6,000,000 aggregate

\* \* \*

C.  Workers Compensation and Employers Liability insurance ...

\* \* \*

D.  Umbrella or Excess Policies In the event [Metro] utilizes Umbrella or excess policies, these policies shall "follow form" and afford no less coverage than the primary policy.

(Doc. No. 55, Ex. A-4 at Bates 1590-91.)

Metro separately agreed to release and indemnify UP for losses as follows:

> [Metro], to the extent it may lawfully do so, waives and releases any and all claims against [UP] for, and agrees to indemnify, defend and hold harmless [UP], its affiliates, and its and their officers, agents and employees ("Indemnified Parties") from and against, any loss, damage (including without limitation, punitive or consequential damages), injury, liability, claim, demand, cost or expense (including, without limitation, attorneys' fees and court costs), fine or penalty (collectively, "Loss") incurred by any person (including, without limitation, [UP], [Metro], or any employee of [UP] or [Metro]) and arising from or related to (i) any use of the Premises by [Metro] or any invitee or licensee or [Metro], (ii) any act or omission of [Metro], its officers, agents, employees, licensees or invitees, or (iii) any breach of this Lease by [Metro].

(Id. at Bates 1587.)   The agreement limited the indemnity to situations where UP was not solely negligent. (Id.)

### C.  The Insurance Policies

To secure insurance coverage for the light rail transportation system, Metro retained the services of Willis of Texas, an insurance broker.  With the assistance of Willis of Texas, Metro

purchased a Railroad Protective Liability policy ("RPL"), a Wrap-Up policy, and an Umbrella or

Excess policy. First, with regard to the RPL, in exchange for Metro's payment of a $29,760

advance premium, which was based on a contract cost of $30,000,000, Liberty Mutual issued

RPL policy number TE2-691-004173-031. The RPL listed "Union Pacific Railroad Company"

as the Named Insured and "Metropolitan Transit Authority of Harris County" as the "Designated

Contractor." (Doc. No. 64, Ex. A.) The policy provided liability limits in the amount of

$2,000,000 per occurrence, or an aggregate limit of $4,000,000. The effective dates of coverage

under the RPL were from March 14, 2001 to September 14, 2004. (*Id.*)

Liberty Mutual also issued Wrap-Up policy number RG2-691-004173-011, in which

"Metropolitan Transit Authority of Harris County" was listed as the Named Insured. (Doc. No.

64, Ex. B.) The Wrap-Up policy, consisting of three layers, included an Owner Controlled

Consolidated Insurance Program ("OCCIP"), a General Amendatory Endorsement ("GAE"), and

a Commercial General Liability Insurance ("CGL") policy. (*Id.*) The policy provided a limit of

liability for personal injury and property damage to $2,000,000 per occurrence, a general

aggregate limit (other than Products-Completed Operations) of $4,000,000, and a Products-

Completed Operations Aggregate Limit of $4,000,000. (*Id.*) The effective dates for coverage

under this policy were from March 14, 2001 to September 14, 2001.

In addition, Lloyd's issued Commercial Umbrella or Excess policy number

576/UF727270000, with effective dates of coverage from March 14, 2001 to September 14, 2004.

(Doc. No. 65, Ex. B.) The "Schedule" listed "the Assured" as "The Metropolitan Transit

Authority of Harris County, Texas (Metro) and others, all as more fully set forth in the attached

Policy Wording." The Declarations listed the "Named Insured" as "THE METROPOLITAN

TRANSIT AUTHORITY OF HARRIS COUNTY, TEXAS (METRO), Contractors,

Subcontractors of any tier and Consultants and Sub-Consultants of any tier, for whom any afore-

mentioned Insureds have agreed by contract to furnish the insurance coverage provided under

this policy per the project." (*Id.*)  As set forth in the Declarations page, the Umbrella policy

provided limits of $50,000,000 per occurrence, $50,000,000 General Aggregate (in accordance

with Section III, Limits of Insurance), and  $50,000,000 Products-Completed Operations

Aggregate for the period (otherwise in accordance with Section III, Limits of Insurance).  The

Declaration page also provided that there was a $25,000 "Self Insured Retention (inclusive of

Defense Costs)." (*Id.*)

### D.  The Accident, Subsequent Claims & Settlements

On January 23, 2004, Christopher McGinnis, a UP worker, was operating one of UP's

Hyrail vehicles.  He was traveling to a work site on the railroad tracks.  As he waited behind

another Hyrail vehicle that had already crossed the LRV test track and had maneuvered onto the

rail road tracks, another UP employee manually lifted the crossing arm so that McGinnis could

also cross the test track and maneuver his Hyrail vehicle onto the railroad tracks.  McGinnis was

not aware that a LRV was approaching the crossing.  The LVR, unable to stop, collided with

McGinnis's Hyrail vehicle.  The collision seriously injured McGinnis.  Several individuals on

the LRV also sustained injuries.

Following the collision, the individuals on the LRV who were injured brought suit

against UP and McGinnis, and McGinnis filed the instant suit against UP.  UP placed Liberty

Mutual on notice of the loss, tendered both the claims and suits brought against it to Liberty

Mutual under the RPL policy, and demanded a defense and indemnity.  In addition, pursuant to

6

the contractual indemnification obligation in the Lease Agreement, UP tendered the claims and suits brought against it to Metro. Metro, in turn, tendered UP's demands for contractual indemnity to Liberty Mutual and demanded a defense and indemnity under the CGL policy. Liberty Mutual denied UP's demand for defense and indemnity under the RPL policy. Liberty Mutual also denied Metro's demand for coverage. UP and Metro made similar demands for defense and indemnity to Lloyd's under the Umbrella policy, but their demands were denied.

After conducting an investigation of the accident, UP decided to settle the claims brought by the individuals on the train, as well as the lawsuit brought by McGinnis. UP alleges that it paid close to six million dollars to settle all the bodily injury and property damages claims arising out of the accident.

## II. PROCEDURAL BACKGROUND

Plaintiff Christopher McGinnis filed his Complaint against UP on January 19, 2007. McGinnis settled his claims UP on March 23, 2007. On March 29, 2007, before the case was officially closed, UP filed its Third-Party Complaint against Liberty Mutual and Lloyd's for the following: (1) breach of contract under the RPL and the Umbrella policy; (2) declaratory judgment; (3) violations of Sections 541.060, 541.061, 541.151, and 542.051 of the Texas Insurance Code; (4) fraud; and (5) in the alternative, reformation of the policies based on mutual mistake, and relief based on waiver and estoppel. (Doc. Nos. 9 & 46.) Metro successfully intervened in the action on April 5, 2007. (Doc. Nos. 13 & 14.) Metro's Complaint, and Amended Complaint in Intervention, allege the same causes of action brought by UP. (Doc. No. 47.)

7

Meanwhile, on April 5, 2007, Liberty Mutual and Lloyd's filed a lawsuit based on the same policies and events in the 133rd Judicial District Court of Harris County, Texas, effecting service on April 10, 2007. Discovery in the state case was conducted for use in either court. Thereafter on January 30, 2008, UP filed an Amended Third-Party Complaint (Doc. No. 46) and Metro filed an Amended Intervenor Complaint (Doc. No. 47.) Amended Answers were then filed by Third-Party Defendants Liberty Mutual and Lloyd's.

Each of the parties then filed Motions for Summary Judgment. On June 16, 2008, Liberty Mutual and Lloyd's filed their respective Motions for Summary Judgment with each maintaining that, for various reasons, no coverage exists under the Railroad Protection Liability policy ("RPL"), the Wrap-Up policy, or the Umbrella policy. Also on June 16, 2008, Metro filed its Motion for Partial Summary Judgment (Doc. No. 65) and, on June 19, 2008, UP filed Motions for Partial Summary Judgment with regard to the RPL and the Umbrella policy. (Doc. Nos. 67 & 69.) The parties have filed their respective responses and replies and, thus, this case is ripe for adjudication.

## III.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A fact is "material" if its resolution in favor of one party might affect the outcome of the suit under governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also United States v. Arron*, 954 F.2d 249, 251 (5th Cir. 1992).

"An issue is genuine if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party." *Cooper Tire & Rubber Co. v. Farese*, 423 F.3d 446, 454 (5th Cir. 2005).

Under Rule 56(c), the moving party bears the initial burden of informing the court of the basis for its belief that there is an absence of a genuine issue for trial and of identifying those portions of the record that demonstrate such an absence. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 576, 586-87 (1986); *see also, Burge v. Parish of St. Tammany*, 187 F.3d 452, 464 (5th Cir. 1999).

Where the moving party meets its initial burden under Rule 56(c), the burden then shifts to the nonmovant to show a genuine issue of material fact exists that precludes summary judgment. "[T]he nonmoving party must come forward 'with specific facts showing that there is a *genuine issue for trial.*'" *Matsushita*, 475 U.S. at 586-87 (quoting FED. R. CIV. P. 56(e)) (emphasis in original); *see also, Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). To sustain the burden, the nonmoving party must produce evidence admissible at trial. *See Anderson*, 477 U.S. at 242; *see also, Thomas v. Price*, 975 F.2d 231, 235 (5th Cir. 1992) ("To avoid summary judgment, the nonmoving party must adduce evidence which creates a fact issue.").

At the summary judgment stage, the court views the facts in a light most favorable to the nonmoving party and draws all reasonable inferences in favor of the nonmovant, but only when "there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 127 S.Ct. 1769, 1776, 167 L.Ed.2d 686 (2007); *see also Goodson v. City of Corpus Christi*, 202 F.3d 730, 735 (5th Cir. 2000) ("[T]he nonmoving party may not rest on the mere allegations or denial of its pleadings, but must respond by setting forth specific facts indicating a genuine issue for trial."). "[A] nonmovant cannot overcome summary judgment with conclusory allegations and

unsubstant a:ed assertions." *Mace v. City of Palestine*, 333 F.3d 621, 624 n. 7 (5th Cir. 2003);

*see also Johnston v. City of Houston, Tex.*, 14 F.3d 1056, 1060 (5th Cir. 1994) ("only evidence–

not argument, not facts in the complaint–will satisfy the burden."). Nor can the nonmovant

overcome summary judgment by showing "some metaphysical doubt as to the material facts" in

an attempt to create a genuine dispute. *Matsushita*, 475 U.S. at 584-86.

IV.    ANALYSIS

    Texas rules of contract interpretation apply in this diversity case. *Canutillo Indep. Sch.*

*Dist. v. National Union Fire Ins. Co.*, 99 F.3d 695, 700 (5th Cir.1996). The interpretation of

insurance contracts is governed by the same rules that apply to contracts generally. *Id.* They

must be interpreted to effectuate the intent of the parties at the time the contracts were formed.

*Kelley-Coppedge, Inc. v. Highlands Ins. Co.*, 980 S.W.2d 462, 464 (Tex. 1998); *Glover v. Nat'l*

*Ins. Underwriters*, 545 S.W.2d 755, 761 (Tex. 1977). When the words of a policy are

unambiguous, they are to be given their plain, ordinary, and generally accepted meaning, unless

the policy clearly indicates that the contractual terms have been used in a different of technical

sense. *Puckett v. U.S. Fire Ins. Co.*, 678 S.W.2d 936, 938 (Tex. 1984). When the language of a

policy is susceptible to more than one construction, however, it should be construed strictly

against the insurer and liberally in favor of the insured. *Barnett v. Aetna Life Ins. Co.*, 723

S.W.2d 663, 666 (Tex. 1987); *see also, Nat'l Union Fire Ins. Co. v. Hudson Energy Co.*, 811

S.W.2d 552, 555 (Tex. 1991) (holding that any ambiguities in a policy are construed against the

drafter). Where the question of interpretation involves an exception or limitation on the insurer's

liability under the policy, an even more stringent construction is required. *Barnett*, 723 S.W.2d at

666.

## V.    RAILROAD PROTECTIVE LIABILITY ACT

### A.  Liberty Mutual and UP's Cross Motions for Summary Judgment

Liberty Mutual and UP have filed cross motions for Summary Judgment regarding the

RPL policy. Liberty Mutual contends that there is no coverage for UP under the RPL for the

following reasons: (1) the bodily injury and property damage were not related to or in connection

with the "work" described in the policy; and (2) any coverage would be excluded based on the

"completed work" exclusion, the non-insured's contractual liability exclusion, and the sole

proximate cause exclusion. (Doc. No. 64.) UP responds that the bodily injury and property

damage fall were covered, and that Liberty Mutual failed to establish the application of its policy

exclusions. (Doc. No. 74.)

UP seeks declaratory relief under the RPL policy based on the following grounds:  (1)

that the policy provides coverage for bodily injury or property damage arising out of acts or

omissions at the test track and related to work or operations performed by Metro or its

subcontractors; (2) that liability is established, as a matter of law, by the settlement of the

underlying claims; (3) that Liberty Mutual breached its duty to defend UP; (4) that the

"completed work" exclusion does not apply; and (5) that Liberty Mutual breached its duty to pay

for property damage to UP's Hyrail vehicle. (Doc. No. 67.) UP also contends that it is entitled to

recover attorney fees from Liberty Mutual. (*Id.*)

### B.  Coverage for Bodily Injury and Property Damage

Liberty Mutual contends that, under the RPL policy, the covered work, as described in

the Declarations, was clearly and unambiguously limited to laying the test track, and the accident

occurred after the test track was completed.  Conversely, UP maintains that the covered work, as

11

described in the Declarations, was not limited to (or intended to be limited to) the construction of

the test track, but also included the testing or commissioning of the LRV on the test track.

The Court starts with the policy language. As contained in "Section I - Coverages," the

RPL provides:

> ... [Liberty Mutual] will pay those sums that the insured becomes legally
> obligated to pay as damages because of "bodily injury" or "property damage" ...
> [arising] out of acts or omissions at the "job location" which are related to or are
> in connection with the "work" described in the Declarations.

(Doc. No. 64, Ex. A; Doc. No. 65, Ex. A-6.)

There is no dispute that UP is the named insured under the policy. (Doc. No. 64, Ex. A.)

Nor can there be any dispute that UP was "legally obligated to pay" damages because of "bodily

injury" or "property damage." *Lennar Corp. v. Great Am. Ins. Co.*, 200 S.W.3d 651, 680

(Tex.App.–Houston [14th Dist.] 2006, pet. denied) (interpreting "legally obligated to pay" to

mean an obligation imposed by law, such as an obligation to pay pursuant to a judgment,

settlement, contract or statute); *Comsys Info. Tech. Serv. Inc. v. Twin City Fire Ins. Co.*, 130

S.W.3d 181, 189 n. 3 (Tex.App.–Houston [14th Dist.] 2003, pet. denied) (recognizing a judgment

is not the only manner by which an insured can become legally obligated to pay because a legal

obligation can also arise out of a contract, such as a settlement); *Texas Prop. & Cas. Ins. Guar.

Ass'n v. Boy Scouts of Am.*, 947 S.W.2d 682, 691 (Tex.App.–Austin 1997, no writ). The policy

defines "job location" as follows: "the job location designated in the Declarations including any

area directly related to the 'work' designated in the Declarations. 'Job location' includes the

ways next to it." (Doc No. 64, Ex. A, Section V – Definitions.) The Declarations page

designates "Houston, Texas" as the "job location." (*Id.*)[1]  The bodily injury or property damage arose out of acts or omissions at the job location, which was Houston, Texas.

The dispute between the parties is over the policy provision which requires that the acts or omissions at the "job location" must be related to or connected with the "work" as described in the Declarations.  "Related to or connected with" is not defined in the policy.  Texas courts have broadly construed the phrase "aris[ing] out of [or] . . . related to or . . . in connection with." *Utica Nat'l Ins. Co. v. American Indem. Co.*, 141 S.W.3d 198, 203 (Tex. 2004) ("'arise out of' means that there is simply a 'causal connection or relation,' which is interpreted to mean that there is but for causation, though not necessarily direct or proximate causation"); *Scottsdale Ins. Co. v. Texas Sec. Concepts & Investigation*, 173 F.3d 941, 943 (5th Cir. 1999) (phrase "arising out of" means that "a claim need only bear an incidental relationship to the described conduct[.]"); *Fontenot v. Mesa Petroleum Co.*, 791 F.2d 1207, 1214 (5th Cir. 1986) (language "arising in connection herewith" contained in indemnity agreement unambiguously encompasses all activities reasonably incident to or anticipated by principal activity of contract).  The policy defines "work" to mean "work or operations performed by the 'contractor' including materials, parts or equipment furnished in connection with the work or operations."  "Operations," while not defined in the policy,[2] ordinarily means "the operating of or putting and maintaining in action

---

[1] Inconsistent with the Declarations page, Liberty Mutual erroneously refers to the Job Location as "a two-mile span 25 feet from existing track." (Doc. No. 64 at 6.)

[2] When not defined in an insurance policy, a court will give the terms used in the insurance contract their ordinary and generally accepted meaning. *Pa. Pulp & Paper Co. v. Nationwide Mut. Ins. Co.*, 100 S.W.3d 566, 574 (Tex.App.–Houston [14th Dist.] 2003, pet. denied).

of something (as a machine or an industry)." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1581 (1993).

The cornerstone of the parties' dispute centers on the meaning and scope of the "work" described in the Declarations. In particular, Item 6 of the Declarations page, which is titled the "Designation of the Job Site and Description of Work," provides the following:

> Two mile test track built 25 feet from existing track. Metro will be laying track across an existing bridge that runs over Union Pacific tracks (no bridge construction).

(Doc. No. 64, Ex. A.) Liberty Mutual contends that "[t]he above designation unambiguously limits the scope of the 'work' to the laying of a two-mile test track" and since the accident occurred after the test track was completed, there is no coverage. UP counters that Liberty Mutual's position is flawed for several reasons. First, UP contends that Liberty Mutual only reaches this interpretation by reading the first and second sentences together and, thus, arguing that the work described in the Declarations only consisted only of laying the "[t]wo mile test track" that was "25 feet from existing track." UP maintains that Liberty Mutual has improperly merged the two sentences together because each sentence actually refers to a separate job site. In support of its argument, UP offers evidence, in the form of the RPL Policy Questionnaire, which it states clarifies that the two sentences, in fact, refer to two separate areas or job sites where an exposure point existed. Second, UP argues that, once clarified, Item 6 is ambiguous because it can reasonably be read as describing the job site (*i.e.*, the two-mile test tract which was built 25 feet from an existing track) as opposed to providing a description of the work to be done at this location.

### 1. Whether an Ambiguity Exists

14

Determining whether an ambiguity exists in a contract is a question of law which a court decides in light of the surrounding circumstances. *R&P Enterprises LaGuarta, Gavrel & Kirk, Inc.*, 596 S.W.2d 517, 518 (Tex. 1980). "A court may conclude that a contract is ambiguous even in the absence of such pleading by either party." *Sage Street Assoc. v. Northdale Construction Co.*, 863 S.W.2d 438, 445 (Tex. 1993); *see also, Texas v. American Tabacco Co.*, 463 F.3d 399, 407 n. 14 (5th Cir. 2006). A contract is not ambiguous if it can be given a definite or certain meaning as a matter of law. *Nat'l Union Fire Ins. Co. v. CBI Industries, Inc.*, 907 S.W.2d 517, 520 (Tex. 1995). An ambiguity will exist if the contract language is "uncertain and doubtful or it is reasonably susceptible to more than one meaning." *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). An ambiguity does not arise based merely on conflicting interpretations of the contract language. *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 134 (Tex. 1994). Parole evidence is also not admissible to render a contract ambiguous. *Sun Oil Co. (Delaware) v. Madeley*, 626 S.W.2d 726, 732 (Tex. 1981).

An ambiguity may be patent (*i.e.*, evident on the face of the contract), or latent (*i.e.*, apparent when a contract is applied to the subject matter with which the contract deals). *CBI Indus., Inc.*, 907 S.W.2d at 520 (a latent ambiguity exists when the contract appears to convey a sensible meaning on its face, but it cannot be carried out without further clarification). When a latent ambiguity arises, the focus shifts to the facts and circumstances under which the agreement was made (*Centerpoint Energy Houston Elec., L.L.P. v. Old TJC Co.*, 177 S.W.3d 425, 431 (Tex.App –Houston [1st Dist.] 2005, pet. denied)), and parol evidence is admissible for the purpose of ascertaining the true intention of the parties as expressed in the agreement. *CBI Indus., Inc.*, 907 S.W.2d at 520; *see also, Balandran v. Safeco Ins. Co. of America*, 972 S.W.2d

738, 741 ("Tex. 1998) (court examined surrounding circumstances); *Bache Halsey Stuart Shields, Incorp. v. Alamo Savings Assoc. of Texas*, 611 S.W.2d 706, 708 (Tex.Civ.App.–San Antonio 1980, no writ) (quoting *Murphy v. Dilworth*, 151 S.W.2d 1004, 1005 (Tex. 1941) ("[W]here a question concerning the interpretation of a contract arises, a court will 'take the wording of the instrument, consider the same in light of the surrounding circumstances and apply the pertinent rules of construction thereto and thus settle the meaning of the contract.'")). "This does not mean, however, that the parties may prove the making of an agreement different from that expressed in the written contract, nor that the unambiguous language used in the contract may be violated or the legal effect thereof changed." *Murphy*, 151 S.W.2d at 1005. Instead, "[i]t can do no more than explain the doubtful relations of the instrument consistently with the relations of the parties, the subject matter of the contract, and the other incidents thereof." *Id.* at 1006.

In the instant case, in an attempt to show the surrounding circumstances from which a latent ambiguity emerged, UP asks the Court to consider the RPL Policy Questionnaire. While Liberty Mutual objects to the introduction of the RPL Application on the ground that consideration of the extrinsic evidence it is improper, the Court **OVERRULES** the objection as the evidence is permissible to show the circumstances surrounding the contract.

As urged by UP, the RPL Policy Questionnaire clarifies the circumstances surrounding the policy. The responses to the RPL Policy Questionnaire were provided to Liberty Mutual by Willis of Texas. (Doc. No. 67, Ex. 4.) The responses to the questionnaire provided that the total estimated cost of the job was $30 million with an estimated $4.5 to $4.7 million of the total amount attributed to the cost of the work within 50 feet of the railroad tracks. (*Id.*) In response to a question regarding the "duration of the work within 50 feet of tracks," Willis of Texas

16

responded that "[b]ecause LRV testing will be done assume testing will occur on tracks within 25 feet of existing track for the term." (*Id.*) Further, when asked about the "Location/Description of Project plus work directly affecting railroad operations," Willis of Texas responded that "[t]here will be a two mile test track built 25 feet from existing track. Metro will by laying track across an existing bridge that runs over Union Pacific tracks (no bridge construction)." (*Id.*) However, Willis of Texas further qualified that "[t]wo exposure points exist. The rail yard where the light rail vehicles (LRVs) are being assembled and tested and railroad overpass. The overpass is an existing bridge." (*Id.*)

In light of the surrounding circumstances of the contract, the two sentence description contained in Item 6 referred to two different sites. Given this clarification, as urged by UP, the Court agrees that an ambiguity exists because an alternate, but just as reasonable, interpretation of Item 6 is that the first sentence ("Two mile test track built 25 feet from existing track) merely describes the location where work would be done, but not the action to be taken at that location.

### 2. The Effect of the Ambiguity

Generally, Texas law provides that, when an insurance contract is susceptible to more than one reasonable interpretation, a court must resolve the uncertainty by adopting the construction that most favors the insured. *Barnett*, 723 S.W.2d at 666. This rule is derived from the more general rule that ambiguous contracts are construed against the drafter. *Balandran*, 972 S.W.2d at 741 n.1; *Temple-Eastex, Inc. v. Addison Bank*, 672 S.W.2d 793, 798 (Tex. 1984). However, in the present case, the Court's concern is that the description of the work found in Item 6 of the Declarations was derived, almost verbatim, from the RPL application that Willis of Texas completed and provided to Liberty Mutual, and, given the incorporated language, it is far

17

from clear what the parties actually intended. Therefore, the Court cannot automatically find coverage based on ambiguity in the insurance agreement. Because the Court finds that this coverage dispute cannot be resolved based on available rules of contract interpretation, the court must resort to parole evidence to determine whether the contracting parties intended the RPL to provide coverage for building the test track, as well as for the use of the track to commission the LRVs. While it is true that the parties have offered parole evidence regarding their intent, the scope of the light rail project, the carrier's classification of the policy, the amount of the premium paid in relation to the project, and the purported post-accident conduct by Liberty Mutual in extending the policy for testing, genuine issues of material fact exist which preclude this Court from deciding this issue as a matter of law. Instead, the Court reserves for the trier of fact the disputed issue concerning the scope of the work as set forth in the Item 6 of the Declarations. Accordingly, on the issue of coverage under the RPL policy, Liberty Mutual's Motion for Summary Judgment and UP's Motion for Partial Summary Judgment on this issue of coverage under the RPL policy are both denied.

### C.  Coverage for UP's Property Damage

UP also seeks a declaration that it is entitled to coverage for the damage to its property. (Doc. No. 67 at 21.) Liberty Mutual responds that the policy's liability coverage will not extend to cover damage to UP's own property.  (Doc. No. 71 at 17.)  UP clarifies that it is not making a claim under Coverage A (Liability), but is instead making a claim under Coverage B (first-party property damage coverage).  (Doc. No. 91 at 19.)  Coverage B provides:

> We will pay for "physical damage to property" to which this insurance
> applies.  The "physical damage to property" must occur during the policy
> period.  The "physical damage to property" must arise out of acts or

18

> omissions at the "job location" which are related to or in connection with the "work" described in the Declarations. The property must be owned by or leased or entrusted to you under a lease or trust agreement.

(Doc. No. 64, Ex. A.) The policy defines "physical damage to property" as "direct and accidental loss of or damage to rolling stock and their contents, mechanical construction equipment or motive power equipment, railroad tracks, roadbeds, catenaries, signals, bridges or buildings.' (Id.)

Liberty Mutual does not dispute that the damage to UP's signal clearly falls within the definition of "physical damage to property." Liberty Mutual disputes whether the Hyrail vehicles involved in the accident fall within the definition of "physical damage to property" because they are not mechanical construction equipment or motive power equipment." (Doc. No. 71 at 17.) The policy does not define "mechanical construction equipment" or "motive power equipment" and, as such, the terms should be given their plain, ordinary meaning. (Doc. No. 91 at 9.) UP urges that the "undisputed evidence is that the two [Hyrail] vehicles involved in the Accident were 'mechanical [track] construction equipment' and/or 'motive power equipment' in the ordinary sense of those words." (Id.) The Court agrees with UP; however, this does not resolve the dispute. Similar to the coverage provision discussed above, Coverage B still requires that the "physical damage to property must arise out of acts or omissions at the 'job location' which are related to or in connection with the 'work' described in the Declarations." (Doc. No. 64, Ex. A.) For the same reasons previously discussed, the Court reserves for the trier of fact the disputed issue concerning the scope of the work as set forth in the Item 6 of the Declarations. Accordingly, UP's Motion for Partial Summary Judgment as to the RPL's coverage for property damage is denied.

### D. The Completed Work Exclusion

Liberty Mutual and UP have also filed cross-motions on whether the RPL excludes coverage for bodily injury or property damage that occurs after the work is completed. In particular, the Completed Work Exclusion in the policy provides:

> The "work" will be deemed completed at the earliest of the following times:
>
> (1) When all the "work" called for in the "contractor's" contract has been completed.
> (2) When all the "work" to be done at the "job location" has been completed.
>
> (3) When that part of the "work" done at the "job location" has been put to its intended use by you, the governmental authority or other contracting party.

"Contractor" is defined under the policy to mean "the contractor designated in the Declarations and includes all subcontractors working directly or indirectly for that 'contractor' but does not include you." Metropolitan Transit Authority of Houston is listed on the Declarations page as the "Designated Contractor." In addition, the policy defines "work" to mean "work or operations performed by the 'contractor,' including materials, parts or equipment furnished in connection with the work or operations."

There is no real dispute that the test track at this job location was laid or that the testing of the light rail trains was in progress. Instead, once again, the dispute centers on the meaning and scope of "work" as defined in the policy and as harmonized with the "work" described in the Declarations. (*See* Doc. No. 91 at 18.) Liberty contends that the completed work exclusion was triggered because the earliest of the times delineated was when Metro completed laying the test track 25 feet from the UP track, and the test track was put to its intended use by the contracting

party, whereas UP counters that the "work" did not just consist of laying the track, but also included the testing or commissioning of each of the light rail trains.  Once again, for the same reasons previously discussed, the Court reserves for the trier of fact the disputed issue concerning the scope of the work as set forth in the Item 6 of the Declarations.  Accordingly, both Liberty Mutual's Motion for Summary Judgment and UP's Motion for Partial Summary Judgment on this point must be denied.

### E.  The Non-Insured Contract Liability Exclusion

Liberty Mutual maintains that coverage does not extend to UP under the RPL due to the non-insured contract liability exclusion.  (Doc. No. 64 at 11-12.)  The policy excludes coverage "for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement."  (Doc. No. 64, Ex. A.)  For the purposes of the exclusion, Union Pacific did not assume the liability in a contract or agreement; rather, it was Metro who assumed the liability, and Metro is not an insured as defined under the policy.  Thus, this exclusion is inapplicable and Liberty Mutual's Motion for Summary Judgment on this point is denied.

### F.  Sole Proximate Cause of Loss Exclusion

Liberty Mutual claims that "Union Pacific is solely to blame for the accident" and, therefore, coverage is precluded based on the policy's sole proximate cause of loss exclusion. (Doc. No. 64 at 12.)  The RPL policy contains an exclusion for "Acts or Omissions of Insured." The exclusion provides:

> "Bodily injury" or "property damage", the sole proximate cause of which is an act or omission of any insured other than acts or omissions of any of "your designated employees".  This exclusion does not apply to injury or damage sustained at the "job location" by any of "your designated employees" or employee of the "contractor", or by any employee of the

21

> governmental authority or any other contracting party (other than you)
> specified in the Declarations.

(Doc. No. 54, Ex. A at 2.)

UP counters that Liberty Mutual has not established, as a matter of law, that UP was "the sole proximate cause" of this accident.  UP initially maintains that this exclusion is limited to UP or its corporate executives and does not apply to any alleged negligence on the part of either UP worker Christopher McGinnis or the other UP worker involved in the accident.  For purposes of this exclusion, the policy defines "insured" as: "(1) 'you' (the named insured shown in the declarations or [UP]); (2) your 'executive officers' and directors, but only with respect to their duties as your officers and directors; (3) your stockholders; and (4) any railroad operating over your tracks." (*Id.*, Ex. A at 3.)  Notably, as urged by UP, the policy's definition of "insured" does not include all UP employees.[3]

Under Texas law, exclusions in an insurance policy must be construed narrowly. *Barnett*, 723 S.W.2d at 666; *Glover*, 545 S.W.2d at 761.  Had Liberty Mutual wanted to exclude coverage when the sole proximate cause of the loss was caused by either UP or any of UP's employees, it could have explicitly done so, and the failure to include UP's employees within the explicit definition of "insured" suggests that this particular policy exclusion should be construed against Liberty Mutual. *Barnett*, 723 S.W.2d at 665.  Notwithstanding this fact, summary judgment is inappropriate because, as conceded by the parties (*See* Doc. No. 74 at 16-20; Doc.

---

[3]  Although irrelevant given the facts in this case, the policy also defined "insured" to include "your designated employees" which were defined as: "(a) [a]ny supervisory employee of yours at the 'job location'; (b) [a]ny employee of yours while operating, attached to or engaged on work trains or other railroad equipment at the 'job location' which are assigned exclusively to the 'contractor'; or (c) [a]ny employee of yours not described in a.

No. 84 at 9 n. 11), the determination of whether UP's acts or omissions were the sole proximate cause of the collision is normally a question of fact. *See generally, Texas Pacific Indem. Co. v. Bldg Material Distrib. Inc.*, 508 S.W.2d 488, 489 (Tex.Civ.App.–Waco 1974, writ ref'd n.r.e.) (sole proximate cause was defined for a jury to mean "the only proximate cause [and] [i]f there is more than one proximate cause of an event, then no single proximate cause can be the sole proximate cause."). Furthermore, as urged by UP, this exclusion does not apply to bodily injury or property damage sustained by employees of the "contractor," or by any employee of the governmental authority, or any other contracting party specified in the declarations. "Contractor" is defined to include the contractor designated in the Declarations, which is Metro, and "all subcontractors working directly for that 'contractor' [Metro]." (Doc. No. 64, Ex. A. at p. 6 of 7.) Thus, with regard to the injury or damage sustained by either Metro employees or employees of its subcontractors, the exception to the exclusion applies. Thus, this exclusion would not preclude coverage for the $465,702.05 UP paid to settle injury or damage claims brought by either Metro employees or its subcontractors. (Doc. No. 74 at 17.)

Accordingly, based on the reasons stated, Liberty Mutual's Motion for Summary Judgment based on the sole proximate cause of loss exclusion is denied.

### G. Fraud, Mutual Mistake And Estoppel

Liberty Mutual seeks dismissal of UP and Metro's claims of fraud, mutual mistake and estoppel as it relates to the RPL policy. (Doc. No. 64 at 21-24.) These issues, however, are inextricably linked to the determination regarding the scope of work to which the RPL policy

---

or b. above who is specifically loaned or assigned to the work of the 'contractor' for the prevention of accidents or protection of property." (Doc. No. 64, Ex. A at 7.)

applied. The Court, having reserved the disputed issue concerning the scope of the work to a trier of fact, defers these issues as well. Liberty Mutual's Motion for Summary Judgment on the ground that UP and Metro's claims for fraud, mutual mistake, and estoppel with regard to the RPL is denied.

### H. UP's Insurance Code Claims

Liberty Mutual seeks dismissal of UP's claims which allege violations of various insurance provisions. Liberty Mutual contends that where there is no coverage, there can be no violation. Liberty Mutual also asserts that UP's claims under the insurance code are barred by limitations. (Doc. No. 64 at 20.) The Court concludes that the determination of these issues is best deferred pending the resolution of the coverage issues. Liberty Mutual's Motion for Summary Judgment on this ground is, therefore, denied without prejudice to reconsideration if appropriate.

### I. Attorney's Fees

UP seeks to recover attorney fees for the prosecution and defense of this suit pursuant to Sections 37.009 and 38.001 of the Texas Civil Practice and Remedies Code. (Doc. No. 67 at 22.) Liberty Mutual argues that UP is not entitled to recover attorney's fees under Section 38.001 because it has not prevailed. (Doc. No. 71 at 24.) Liberty Mutual also argues, relying on *Utica Lloyd's of Texas v. Mitchell*, 138 F.3d 208, 209 (5th Cir. 1998), that UP is not entitled to attorney's fees under Section 37.009. (Doc. No. 71 at 24.)

Section 38.001 of the Texas Civil Practice & Remedies Code, in relevant part, provides that "[a] person may recover reasonable attorney's fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for: ... an oral or written

24

contract." TEX. CIV. PRAC. & REM.CODE § 38.001. In order to recover attorney's fees pursuant to Section 38.001, a party must be a prevailing party and recover actual damages on its claim. *See Green Int'l, Inc. v. Solis*, 951 S.W.2d 384, 390 (Tex.1997) ("To recover attorney's fees under Section 38.001, a party must (1) prevail on a cause of action for which attorney's fees are recoverable, and (2) recover [actual] damages."); *see also, Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 201 (Tex.2004) (per curiam) (noting that even though the claimant had a valid claim, it "was not entitled to recover attorney's fees because it was not awarded damages on its breach of contract claim"). In this case, it is premature to consider UP's entitlement, if any, to attorney's fees under Section 38.001. *See Solis*, 951 S.W.2d at 390.

Section 37.009 of the Texas Civil Practice & Remedies Code provides that in any proceeding under the Texas Uniform Declaratory Judgments Act ("DJA"), "the court may award costs and reasonable and necessary attorney's fees as are equitable and just." TEX. CIV. PRAC. & REM.CODE §37.009. However, as urged by Liberty Mutual, the Fifth Circuit's holding in *Utica* forecloses UP's request for attorney's fees under Section 37.009. *Utica Lloyd's of Texas v. Mitchell*, 138 F.3d 208, 209 (5th Cir. 1998) (holding that "a party may not rely on the Texas DJA to authorize attorney's fees in a diversity case because the statute is not substantive law."); *see also, Camacho v. Texas Workforce Comm'n*, 445 F.3d 407, 409-410 (5th Cir.) (reaffirming validity of *Utica*), *cert. denied*, 549 U.S. 826 (2006).

UP's Motion for Partial Summary Judgment seeking attorney's fees under Section 37.009 is denied with prejudice, but its request for attorney's fees under Section 38.001 is denied, without prejudice, as premature.

## VI.   WRAP UP POLICY

25

### A. **Liberty Mutual's Motion for Summary Judgment**

#### 1. **Whether UP is an Insured**

Liberty Mutual maintains that UP is not an insured under the Wrap Up policy. UP responds by requesting the Court to defer any determination of whether it is an insured under this policy until after addressing the RPL policy. In particular, UP argues that if no coverage is afforded under the RPL, then it may qualify as an insured under the GAE. However, considering UP's response to Liberty Mutual's Motion, the Court sees no compelling reason to defer this determination.

Metro procured a Wrap-Up policy for the Light Rail Project. As explained by Liberty Mutual, the Wrap Up policy consists of "a three-layered pyramid" of coverage with the base layer being the Commercial General Liability ("CGL") policy, which was modified by a General Amendatory Endorsement ("GAE"), and then further modified by the Owner Controlled Consolidated Insurance Program Amendment of Coverage ("OCCIP" Amendments). (Doc. No. 64 at 12-13, Ex. B.)

The OCCIP Amendment provides that the insureds protected by the Wrap Up policy include the First Named Insured (Metro), the Additional Named Insureds set forth in the Schedule of the OCCIP Amendment, and any Additional Named Insureds identified in the underlying CGL or GAE. (Doc. No. 64, Ex. B at Bates "Metro 1484".) The "ADDITIONAL NAMED INSURED SCHEDULE" provides:

> All subcontractors of any tier, as their interests may appear, for whom the First Named Insured has agreed by contract to provide general liability coverage under the owner controlled insurance program, excluding vendors, suppliers, off-site fabricators, material dealers and others who merely make deliveries to or from the Project Site(s).

26

(Doc. No. 54, Ex. B at Bates "Metro 1485".)  UP is not a subcontractor of Metro.  Thus, UP is

not an additional insured under the provisions of the OCCIP policy.  UP also does not qualify as

the Named Insured or as an additional insured under the definitions contained in the CGL policy.

(Doc. No. 54, Ex. B at Bates "Metro 1465; 1509; 1519-20".)

Finally, the GAE policy contains a "Blanket Additional Insured" Amendment that

provides:

> SECTION II - WHO IS AN INSURED is amended to include as an
> insured any person, organization, state or other political subdivision,
> trustee or estate for whom you have agreed in writing to provide liability
> coverage.  But:
>
> The insurance provided by this amendment:
>
> 1.  Applies only to "personal injury" or "property damage" arising out of
> (a) "your work" or (b) premises or other property owned by or rented to
> you;
>
> 2.  Applies only to coverage and limits of insurance required by the
> written agreement, but in no event exceeds either the scope of coverage or
> the limits of insurance provided in this policy; and
>
> 3.  Does not apply to any person, organization, state or other political
> subdivision, trustee or estate for whom you have procured separate
> liability insurance while such insurance is in effect, regardless of whether
> the scope of coverage or limits of insurance of this policy exceed those of
> such other insurance or whether such other insurance is valid and
> collectible.

(Doc. No. 64, Ex. B at Bates "Metro 1479".)  In the present case, while it is true that Metro was

required by the Lease Agreement to provide coverage for UP, there is no dispute that Metro

procured separate liability insurance for UP in the form of the RPL.[4]  Nor is there any dispute

that the RPL policy was in effect on the date of the incident.  The Court, therefore, grants Liberty

Mutual's Motion for Summary Judgment on the ground that UP is not an insured under the

Wrap-Up policy.

## VII.   METRO'S CLAIM FOR DECLARATORY RELIEF[5]

Liberty Mutual and Lloyd's assert that Metro should not be permitted to proceed with its

Complaint in Intervention seeking declaratory relief because no justiciable controversy exists

between the parties–namely, Metro and UP.

The federal Declaratory Judgment Act provides, in part, the following:

> In a case of actual controversy within its jurisdiction, ... any court of the
> United States, upon the filing of an appropriate pleading, may declare the
> rights and other legal relations of any interested party seeking such
> declaration, whether or not further relief is or could be sought.

28 U.S.C. § 2201.  The purpose of the Act "is to settle 'actual controversies' before they ripen

into violations of law or a breach of contractual duty."  *Hardware Mut. Cas. Co. v. Schantz*, 178

F.2d 779, 780 (5th Cir. 1949).  A district court has discretion in deciding whether to entertain a

declaratory judgment action.  *St. Paul Ins. Co. v. Trejo*, 39 F.3d 585, 590 (5th Cir. 1994).  In

making this determination, the court must consider (1) whether the declaratory action is

justiciable; (2) whether the court has authority to grant declaratory relief; and (3) whether to

---

[4] By the terms of the terms of the Lease of Property agreement, Metro was required, at its own cost and
expense, to procure an RPL policy for UP. (Doc. No. 64, Ex. C.)

[5] The issue regarding whether Metro's action presents a justiciable controversy is one which is raised
against Metro by both Liberty Mutual and Lloyds under their respective policies.  In fact, in their respective Motions
for Summary Judgment against Metro, Liberty Mutual and Lloyd's adopted and incorporated by reference each

exercise its discretion to decide or dismiss the action. *Orix Credit Alliance, Inc. v. Wolfe*, 212 F.3d 891, 895 (5th Cir. 2000).

The law provides that for an action to be justiciable, an "actual controversy" must exist between the parties. *Wolfe*, 212 F.3d at 895. In other words, to be justiciable, the action "must be such that it can presently be litigated and decided and not hypothetical, conjectural, conditional or based on the possibility of a factual situation that may never develop." *AXA RE Prop. & Cas. Ins. Co. v. Day*, 162 Fed. Appx. 316, 319 (5th Cir. 2006) (quoting *Brown & Root, Inc. v. Big Rock Corp.*, 383 F.2d 662, 665 (5th Cir. 1967)); *see generally*, 10B Charles A. Wright, et al., FEDERAL PRACTICE AND PROCEDURE § 2757 (2008).

In the present case, Liberty Mutual and Lloyds contend that no substantial controversy exists between the parties for several reasons. First, they contend that Metro "has never been sued by the McGinness [sic] Plaintiffs or any other person injured in the Accident," and "[a]t this point in time, more than four years after the Accident, it is clear that no meritorious bodily injury claims will ever be made against METRO." (Doc. No. 64 at 18.) This argument is not persuasive. Even if the injured parties' suits against Metro were barred by the statutory limitation period for torts, any such bar would not preclude UP from pursuing Metro on its contractual indemnity claim. *See Houston Lighting & Power Co. v. Eller Outdoor Advertising Co. of Texas*, 635 S.W.2d 133, 134-35 (Tex.App.-Houston [1st Dist.] 1982, writ ref'd n.r.e.).

Second, Liberty Mutual and Lloyd's argue that, despite the contractual indemnity agreement, Metro "has never paid a dime to Union Pacific as a result of the Accident," and

---

others arguments. To avoid unnecessary duplication, the Court addresses all the insurance carriers arguments against Metro based on justiciability herein.

"[w]hatever demands, if any, Union Pacific may have made to METRO, the demands were never reduced to a final judgment and are not the subject of any pending litigation." (Doc. No. 64 at 18.) Metro counters that the carrier's argument "completely ignores the fact that the critical inquiry is whether METRO has a justiciable controversy," not with UP, but with the insurance carriers. (Doc. No. 76 at 3.) Metro maintains that a controversy exists between itself and the insurance carriers regarding the obligations under the insurance contract and, thus, it is entitled to seek a declaration of its rights against the carriers. (*Id.*) The Court agrees. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 37.004(a) (Vernon Supp. 2007) (authorizing a person interested under a written contract to seek declaratory relief); *American States Inc. Co. v. Bailey*, 133 F.3d 363, 368 (5th Cir. 1998) (recognizing that even where a tort action has not proceeded to judgment, a dispute concerning an insurer's duty to defend or indemnify its insured for losses sustained by a third party presents an actual controversy within the meaning of the federal Declaratory Judgment Act); *Farmers Texas County Mut. Ins. Co. v. Griffin*, 955 S.W.2d 81, 84 (Tex. 1997) (recognizing the necessity of a declaratory judgment action to determine the party's obligation to defend or indemnify even before either a judgment is rendered or a settlement reached); *see generally, Collier v. Allstate County Mut. Ins. Co.*, 64 S.W.3d 54, 62 (recognizing duty to indemnify arises after claim has been adjudicated by judgment, settlement or contract to be legally responsible to pay damages).

Third, Liberty Mutual and Lloyd's contend that Metro's contractual indemnity obligation to UP is "wholly illusory" and, thus, unenforceable, for the following reasons: (1) the indemnity obligation does not satisfy the basic conspicuous test required of indemnity agreements in Texas; (2) a condition precedent to indemnity by Metro is the lack of sole negligence on the part of UP;

30

(3) Metro is not legally liable for any claims stemming from the accident because it enjoys sovereign immunity; and (4) Metro's indemnity agreement with UP is void because it violates Article XI, § 7 of the Texas Constitution, which forbids a governmental entity from creating a debt. (Doc. No. 64 at 19; Doc. No. 66 at 5-10.)  The Court will address each argument in turn.[6]

## A.  Whether Validity Of Indemnity Agreement & The Express Negligence Rule Precludes Metro From Bringing This Action

Under Texas law, release or indemnity agreements are valid and enforceable.  However, because such provisions involve an extraordinary shifting of risk, Texas requires compliance with fair notice requirements.  *See Dresser Indus., Inc. v. Page Petroleum, Inc.*, 853 S.W.2d 505, 508-09 (Tex. 1993).  The fair notice requirement is two-fold:  (1) the party seeking to enforce a release provision must comply with the express negligence doctrine, and (2) the provision must be conspicuous.  *Id.*  Under the express negligence rule, "a party's intent to be released from [or indemnified for] all liability caused by its own future negligence must be expressed in unambiguous terms within the four corners of the contract."  *Arthur's Garage, Inc. v. Rascal-Chubb Sec. Sys. Inc.*, 997 S.W.2d 803, 814 (Tex.App.–Dallas 1999, no pet.) (citing *Ethyl Corp. v. Daniel Const. Co.*, 725 S.W.2d 705, 708 (Tex. 1987); *see also, Storage & Processors, Inc. v. Reyes*, 134 S.W.3d 190, 192 (Tex. 2004).  The conspicuousness rule provides that the releasing language must be conspicuously written so that a reasonable person against whom it is to operate should notice it.  *Reyes*, 134 S.W.3d at 192; *Dresser*, 853 S.W.2d at 508 n.2; *Cate v. Dover Corp.*, 20 S.W.3d 559, 561 (Tex. 1990) (party who, prior to entering into contract, has actual

---

[6] The Court once again notes that, while presented in a different order, these same arguments are made by

knowledge of its terms cannot escape enforcement of those terms on the ground that the terms

are inconspicuous); *Costal Transp. Co. v. Crown Cent. Petroleum Corp.*, 20 S.W.3d 119, 126

(Tex.App.-Houston [14th Dist. 2000, pet. denied) (holding indemnity agreement read by

indemnitor conspicuous and rejecting indemnitor's argument that indemnitee must show that

indemnitor actually noticed the indemnity language when reading the agreement).

The language "any negligence" contained in the Lease Agreement (Doc. No. 65, Ex. A-4,

at Bates 1587) expressly identifies Metro's intent to release UP from liability for UP's

negligence (*see Reyes*, 134 S.W.3d at 192); thus, the provision satisfies the express negligence

doctrine. *See Atlantic Richfield Co. v. Petroleum Pers. Inc.*, 768 S.W.2d 724, 726 (Tex. 1989)

(although not differentiating between degrees of negligence, a contractual indemnity provision

that included "any negligent act of ARCO" was sufficient to satisfy the express negligence

doctrine). Turning to the conspicuousness rule, Metro concedes that it had actual knowledge of

the release provision in the agreement which renders compliance with the fair notice requirement

irrelevant. *See Reyes*, 134 S.W.3d at 192 (conspicuousness rule satisfied where party has actual

knowledge). The indemnity provision contained in the Lease Agreement is valid and enforceable

under Texas law.

### B. Whether Condition Precedent In Indemnity Agreement Precludes Metro From Brining This Action

Liberty Mutual and Lloyd's next argue that no substantial controversy exists between

Metro and UP because Metro's contractual obligation to indemnify UP is contingent on a

determination that UP is not solely negligent. (Doc. No. 64 at 19.) This argument is not

both Liberty and Lloyd's in their Motions for Summary Judgment. (Doc. No. 66 at 5-10.)

persuasive  *See generally*, 10B Charles A. Wright, et al., FEDERAL PRACTICE AND PROCEDURE § 2757 at 475 (2008) (recognizing that "[i]t is clear that in some instances a declaratory judgment is proper even though there are future contingencies that will determine whether a controversy ever actually becomes real"). Further, at issue is Metro's contract with its insurance carrier, not with UP.

### C.  Whether Sovereign Immunity Precludes Metro from Bringing This Action

Liberty Mutual and Lloyd's claims that no substantial controversy exists because Metro enjoys sovereign immunity and, thus, will never be legally liable for any damages. (Doc. No. 64 at 19; Doc. No. 66 at 6-9.) Metro counters that it lawfully purchased insurance to cover UP's potential liability stemming from and as a condition of the Lease Agreement, a fact known to the carriers, and, in the alternative, any immunity Metro may enjoy does not shield the insurance carriers or excuse their  performance under the insurance contract. (Doc. No. 76 at 12-20; Doc. No. 86 at 4-8.)

In Texas, sovereign or governmental immunity deprives a trial court of subject matter jurisdiction for lawsuits in which the state or certain governmental units have been sued unless the entity consents to suit. *Texas Dep't of Transp. v. Jones*, 8 S.W.3d 636, 638 (Tex. 1999); *Fed. Sign v. Tex. S. Univ.*, 951 S.W.2d 401, 405 (Tex. 1997), superseded by statute on other grounds as stated in *General Serv. Com'n v. Little-Tex Insulation Co., Inc.*, 39 S.W.3d 591, 593 (Tex. 2001); *Duhart v. State*, 610 S.W.2d 740, 741 (Tex. 1980); *Hosner v. DeYoung*, 1 Tex. 764, 769 (1847). Governmental immunity includes two distinct principles, immunity from suit and immunity from liability. *Jones*, 8 S.W.3d at 638; *Fed. Sign*, 951 S.W.2d at 405.  Immunity from

33

liability is an affirmative defense, while immunity from suit deprives a court of subject matter jurisdiction. *Jones*, 8 S.W.3d at 638; *Fed. Sign*, 951 S.W.2d at 405.

It is true that a governmental entity does not waive immunity from suit simply by contracting with a private party. *LittleTex*, 39 S.W.3d at 594. Nevertheless, "legislative control over waiving immunity from suit does not mean that the State can freely breach contracts with private parties, or that the State can use sovereign immunity as a shield to avoid paying for benefits the State accepts under a contract." Rather, when a governmental entity contracts with a private party, it waives immunity from liability. *Id.*; *Tooke v. City of Mexia*, 197 S.W.3d 325, 344-45 (Tex. 2006); *Ben Bolt-Palito Blanco Consol. Indep. School Dist. v. Political Subdivisions Prop./Casualty Joint Self-Insurance Fund*, 212 S.W.3d 320, 327 (Tex. 2006); *Catalina Development Inc. v. County of El Paso*, 121 S.W.3d 704, 705 (Tex. 2003).

In the present case, the insurance carriers[7] contend that even if Metro had waived immunity from liability by entering into the lease agreement with UP, its immunity from suit has not been waived and, as such, the carriers are shielded from indemnity. In support of their position, the carriers rely on cases that hold that, unless waived, a governmental entity, like Metro, is immune from suit. Notably, however, the carriers point to no authority that extends the immunity of a governmental entity to its insurance carriers. Instead, as urged by Metro, analogous case law supports the opposite conclusion–namely, that Metro's immunity will not shield the insurance carrier. *United Services Auto. Ass'n v. Blakemore*, 782 S.W.2d 277, 279 (Tex.App.–Waco 1989, writ denied) (in a case where the driver enjoyed sovereign immunity

---

[7] *Supra* note 8.

34

from both suit and damages, the court determined that the driver's immunity did not preclude recovery from the insurance carrier who provided uninsured motorist coverage; to hold otherwise, "[t]he policy language would be rendered absolutely meaningless by interpreting 'legally entitled to recover' as the ability to sue the United States" when sovereign immunity precluded suit). Similarly, in the context of bankruptcy cases, courts have determined that, even where a debtor is discharged, this does not preclude recovery from an insurance carrier who may be liable on behalf of the debtor. *Watkins v. United States*, 462 F.Supp. 980, 991 (S.D. Ga. 1977) (explaining that "any difference between [sovereign immunity] and the effect of a bankruptcy discharge, is legally insufficient" and, therefore, concluding that uninsured motorist coverage was available even though state enjoyed sovereign immunity); *Matter of Edgeworth*, 993 F.2d 51, 54 (5th Cir. 1993) (recognizing that "scope of a section 524(a) injunction does not affect the liability of liability insurers and does not prevent establishing their liability by proceeding against a discharged debtor."); *In re Jet Florida Systems, Inc.*, 883 F.2d 970, 975 (11th Cir. 1983) (emphasizing that neither bankruptcy's "'fresh start' policy" nor "§ 524 was designed to immunize 'third parties such as insurers who may be liable on behalf of the debtor,' and the insurer should not gain a benefit that was not intended or in any way computed within the rate charged for its policy."). As aptly explained by one court, "[a]ny other outcome would result in a windfall to insurers, which receive premiums as the *quid pro quo* for providing insurance. Any other outcome would also disadvantage both innocent, third party, personal injury claimants ...." *In re White*, 73 B.R. 983, 985 (Bkrtcy D. D.C. 1988). Further, to allow the insurance carrier to escape liability on this basis would be "fundamentally wrong." *In re Lembke*, 93 B.R. 701, 703 (Bkrtcy D. N.D. 1988). The holdings in these cases persuades this

35

Court that, while the purpose of sovereign immunity is to protect Metro (and the public), it will not shield third parties, like insurance carriers, who may be liable on behalf of Metro.

### D. Whether Article XI, § 7 Of The Texas Constitution Precludes Metro From Bringing This Action

Liberty Mutual and Lloyd's contend that the indemnity clause in the lease agreement is void because it creates an impermissible debt under the Texas Constitution. Article 11, § 7 of the Texas Constitution, Vernon's Ann. St., provides, in part, that:

> (N)o debt for any purpose shall ever be incurred in any manner by any city or county unless provision is made, at the time of creating the same, for levying and collecting a sufficient tax to pay the interest thereon and provide at least two per cent (2%) as a sinking fund; * * *.

This section, by its own terms, appears limited to city and counties. Moreover, neither insurance carrier offers any authority to indicate that this section would be applied to a governmental entity such as Metro.

Assuming Section 7 applied to Metro, Texas law does provide that an indemnity agreement is a "debt" within the meaning of Article 11, § 7 of the Texas Constitution. *Brown v. Jefferson County*, 406 S.W.2d 185, 188 (Tex. 1966); *Texas & New Orleans R.R. v. Galveston County*, 159 S.W.2d 713 (1943) (citing to *McNeal v. City of Waco*, 89 Tex. 83, 33 S.W. 322 (1895) and *Stevenson v. Blake*, 131 Tex. 103, 113 S.W.2d 525 (1938)). However, this does not mean, as suggested by the insurance carriers, that the indemnity obligation contained in the Lease Agreement created an impermissible debt in violation of the Texas Constitution. For example, in *Brown*, the Texas Supreme Court concluded that an indemnification obligation incurred by a county government was valid and enforceable, even though there was a theoretical

36

possibility that the county's future financial obligations under the indemnity obligation might exceed the county's taxing authority. *Brown*, 406 S.W.2d at 189-90. Distinguishing the facts of its case from *Texas & New Orleans R.R. v. Galveston County*, where the county incurred an open-ended indemnity agreement, which spanned 99 years, without providing any mechanism for paying a future claim under the obligation, the Court in *Brown* upheld the county's obligation because, at the time it agreed to the indemnification, the county put in place sufficient provisions to ensure the satisfaction of any claim on the obligation. *Id.*

Similar to *Brown*, when Metro assumed the indemnity obligation, it provided a mechanism for the payment of claims that might arise under the indemnity agreement by purchasing the insurance policies. In addition, Metro can levy any necessary taxes to fund its obligations incurred in connection with the light rail project. Thus, the Court cannot conclude that the indemnity obligation contained in the Lease Agreement created an impermissible debt in violation of the Texas Constitution.

### E. Whether Metro's Allegations Of Insurance Code Violations Should Be Dismissed In Absence Of Coverage Under the Policy

Liberty Mutual seeks dismissal of Metro's claims under various provisions of the Insurance Code on the grounds that where there is no coverage, there can be no violation of the Insurance Code provisions. Liberty Mutual also contends Metro's claims are barred by the two year statute of limitations. (Doc. No. 64 at 20.) Metro responds by urging that, to the extent there is coverage under the policy, it would be premature for the Court to address the viability of the extra-contractual issues, particularly before any discovery is completed. The Court agrees. Liberty Mutual's Motion for Summary Judgment on this ground is denied without prejudice.

## VIII.   Metro's Motion for Partial Summary Judgment on the Wrap-Up Policy

Metro seeks a declaration that the accident and the resulting liability of Metro and UP triggered Liberty Mutual's obligations under the CGL policy.  Metro contends that "[t]he general liability policy issued by Liberty Mutual to Metro contractually obligates Liberty Mutual to indemnify Metro and Union Pacific for personal injuries and property damage claims resulting from the accident that gives rise to this coverage dispute." (Doc. No. 65 at 3.)  Metro also contends that "Liberty Mutual incorrectly states that at least two exclusions preclude coverage: (1) the 'Products-Completed Operations Hazard' exclusion and (2) the 'auto' exclusion." (*Id.*) In response Liberty Mutual asserts the following:  (1) whatever coverage applies to Metro as a result of the accident is not ripe for adjudication in this declaratory judgment action; (2) Metro is not "legally obligated to pay" any damages because of bodily injury or property damage; and (3) Liberty Mutual does not contend that the "Products-Completed Operations hazard" precludes coverage under the Wrap-Up policy.  (Doc. No. 70 at 2-4.)  The Court proceeds to address the issues.

In the Wrap-Up policy, the CGL Coverage Form contains an insuring agreement which provides:

> We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.

(Doc. No. 64, Ex. B (CGL policy tab).)  According to the OCCIP Amendment, the insurance agreement only applies to bodily injury, property damage, and personal injury arising out of:

> 1.  Operations performed for the First Named Insured or Additional Named Insured by an Additional Named Insured at a Project Site listed in the Designated Project Schedule; or

2.  Acts or omissions of the First Named Insured in connection with its
    supervision of operations performed by an Additional Named Insured at a
    Project Site listed in the Designated Project Schedule....

(Doc. No. 64, Ex. B (OCCIP Amendment tab).)

Metro contends that the undisputed facts giving rise to the accident establish coverage

under the insuring agreement.  First, for purposes of the insuring agreement, there is no dispute

that the First Named Insured is Metro.  Second, Metro maintains that Siemens was an Additional

Named Insured under the Wrap-Up policy.  In order to qualify as an Additional Named Insured,

Siemens must be Metro's subcontractor for whom Metro "agreed by contract to provide general

liability coverage under the owner controlled insurance program ["OCIP"], excluding vendors,

suppliers, off-site fabricators, material dealers and others who merely make deliveries to or from

the Project Site(s)."  (Doc. No. 64, Ex. B (OCCIP Amendment tab) at Bates "Metro 1484".)

While Liberty Mutual concedes that "the Siemens contract provides that Metro will provide an

OCIP policy for Siemens," it asserts that "it is not clear that Siemens is Metro's subcontractor or

that Siemens is not a vendor or off-site fabricator."  (Doc. No. 70 at 6.)  Based on the plain

language of this policy provision, vendors and off-site fabricators are excluded only if they

"merely" make deliveries to or from the Project Site, which, based on the undisputed evidence,

would clearly not have included Siemens.

Third, Metro contends that there is no dispute that:  (1) the bodily injury and property

damage arose out of the commissioning of LRV 115;  (2) that Siemens was performing

operations for Metro by supervising the commissioning of LRV 115; and (3) that Siemens was

engaged in these operations for Metro at a "Project Site listed in the Designated Project

Schedule."  (Doc. No. 65 at 13-15.)  In support of its contentions, Metro relies on the affidavit of

Sharon K. Messa, the Risk Manager for Metro who monitored and directed the resolution of any

claims resulting from the light rail project.  (Doc. No. 65, Ex. A at 2, ¶¶ 1-3.)  In her affidavit,

Messa swears to the following:

> Siemens delivered the first LRV to METRO in April 2003 and the
> installation and commissioning of these vehicles, including the training fo
> METRO's LRV operators, began shortly thereafter.  On January 23, 2004,
> a light rail vehicle ("LRV 115") being commissioned by Siemens and
> being operated by a METRO employee on the test track located on the
> Lease premises collided with a Union Pacific welding truck at crossing #
> 755612H, also identified as the intersection of Kirby Drive and the
> railroad tracks in Houston, Harris County, Texas (the "Accident").  At the
> time of the Accident, Siemens was training and supervising the METRO
> employee that was operating LRV 115.

(*Id.* at 8-9, ¶ 20.)  Liberty Mutual asserts that, aside from the affidavit of Sharon K. Messa, which

it claims is conclusory and not based on personal knowledge, there is no evidence that Siemens

was "even present at the time of the Accident, let alone conducting operations."  (Doc. No. 70 at

6.)  However, given Messa's position with Metro (*i.e.*, Risk Manager who monitored and

directed the resolution of any claims resulting from the light rail project), the Court simply

cannot agree with Liberty Mutual and, therefore, overrules Liberty Mutual's objection to

Messa's affidavit.

Fourth, Metro contends that the accident did not occur within the "Products-Completed

Operations Hazard."  (Doc. No. 65 at 15-16.)  Metro claims that the undisputed facts

demonstrate that Metro's "work" was ongoing at the time of the accident because the Siemens'

Contract called for commissioning of all 18 LRVs prior to final acceptance for use in Metro's

operation of the Light Rail system.  Notably, however, in its response, Liberty Mutual clearly

states that it "does not contend that the "products-completed operations hazard" precludes

coverage under the Wrap-Up policy.  (Doc. No. 70 at 3.)

40

Finally, perhaps the central issue related to the insuring agreement is whether Metro is "legally obligated to pay" for bodily injury or property damage. Liberty Mutual maintains that "legally obligated to pay" can only be established by a judgment against the insured, and since Metro is immune from suit, this has not been established, and, until such point in time as it is, Liberty Mutual is under no obligation to pay under the Wrap-Up policy. There is, of course, no dispute that the Lease Agreement contained the indemnity agreement or that the agreement was entered into before the accident occurred. Nor is there any dispute that, in the Lease Agreement, Metro contractually agreed to assume UP's tort liability as long as UP was not the sole, direct cause of the loss. Finally, there is no dispute that UP has paid to settle the claims arising from this accident and requested Metro indemnify it for the amount it paid pursuant to the indemnity agreement.

Turning back to the insurance policy, the Court finds that the phrase "legally obligated to pay" is not defined in the policy. However, giving the phrase its ordinary meaning (*Pa. Pulp & Paper Co. v. Nationwide Mut. Ins. Co.*, 100 S.W.3d 566, 574 (Tex.App.–Houston [14th Dist.] 2003, pet. denied) (recognizing that courts give terms used in an insurance contract their ordinary and generally accepted meaning unless the policy shows the words were meant in a technical sense)), "it means an obligation imposed by law, such as an obligation to pay pursuant to a judgment, settlement, contract, or statute." *Lennar Corp.*, 200 S.W.3d at 680; *see also, Comsys*, 130 S.W.3d at 189 n. 3 (recognizing a judgment is not the only manner by which an insured can become "legally obligated to pay," because a legal obligation can also arise out of a contract or a settlement); *Boy Scouts of America*, 947 S.W.2d at 691 (same). Here, Metro's legal obligation to pay is by contract. Once UP settled the claims and suits arising from this accident, Metro's

41

obligation under the agreement was triggered.  Accordingly, Metro's Motion for Partial

Summary Judgment on the grounds that coverage is triggered under the Wrap-UP policy is

granted. [8]

### IX.    UMBRELLA POLICY

#### A. Lloyd's, Metro, and UP's Motions for Summary Judgment

With regard to the Umbrella policy, the parties have filed competing Motions for

Summary Judgment.  In its Motion for Summary Judgment, Lloyd's maintains that the action

against it must be dismissed on the following grounds:  (1) Metro and UP lack standing to pursue

their claims (Doc. No. 66 at 5-6); (2) immunity bars UP from asserting any claim against Metro

(*Id*. at 6-9); (3) the indemnity provision in the lease agreement is void (*Id*. at 9-10); (4) UP is not

an additional insured under the Umbrella policy (*Id*. at 11-12); (5) the auto exclusion precludes

coverage for the accident (*Id*. at 12-13); (6) the Umbrella policy only provides coverage during

construction (*Id*. at 13-15); (7) the claims are barred by late notice (*Id*. at 15); (8) the insured(s)

failed to obtain Lloyd's consent to settle the McGinnis case (*Id*. at 15-16); (9) the Umbrella

policy restricts legal action against the insurer because the sums sought by Metro and UP were

not judicially determined (*Id*. at 16-17); (10) Lloyd's had no duty to defend because the

Complaint alleged facts excluded by the policy (*Id*. at 17); and (11) even to the extent coverage

existed, Lloyd's did not act in bad faith (*Id*. at 17-18).  Metro and UP have responded to each of

Lloyd's arguments.

---

[8]      Metro also moves for summary judgment on whether the Wrap-Up policy's auto exclusion precluded
coverage and whether the Lease Agreement constituted the Insured Contract.  Liberty Mutual does not dispute
Metro's position on either; therefore, Metro's Motion for Partial Summary Judgment is granted as on both issues.

In addition, both UP and Metro have filed Motions for Partial Judgment. In its Motion, UP maintains that it is an insured under the Umbrella policy (Doc. No. 69 at 8-12), the scope of coverage includes the test track and operations on the test track as required under the contract documents (*Id.* at 18-19), the auto exclusion does not preclude coverage under the policy (*Id.* at 13-18), and it is entitled to attorneys fees from Lloyd's under section 38.006 of the Texas Civil Practice and Remedies Code. (*Id.* at 12-13).

In its Motion, Metro maintains that Lloyd's is obligated to indemnify Metro for the amounts it owes UP (Doc. No. 65 at 15), the "Products-Completed Operations Hazard" is not applicable because Metro's work was not complete on the date of the accident (*Id.* at 16), the auto exclusion does not preclude coverage (*Id.* at 16-22), and all the conditions precedent of the Umbrella policy have been performed. (*Id.* at 22).

### B. Metro's Standing

In its Motion, similar to the claim asserted by Liberty Mutual, Lloyd's maintains that Metro lacks standing to bring this suit. (Doc. No. 66 at 5-6.) Having discussed the issue above, the Court will not reiterate it herein. Lloyd's Motion for Summary Judgment on the ground that Metro lacks standing to bring this Declaratory Judgment is denied.

### 2. Whether UP Lacks Standing Because It Is Not An Additional Insured

Lloyd's maintains that UP is not an insured under the Umbrella policy. Lloyd's also maintains that Texas is not a direct action state and UP, being nothing more than a third-party claimant, "has no standing to pursue any claims against [it]." (Doc. No. 66 at 6; 11-12.) Conversely, in its Motion, UP maintains that it is an insured under the Umbrella policy based on the following: (1) pursuant to the terms of the Lease Agreement, if Metro purchased an

Umbrella or Excess policy, Metro was required to name UP as an additional insured; and (2) UP

qualifies as an insured based on the definitions contained in the Umbrella policy. (Doc. No. 81

at 2, 8.)

It is true that by the terms of the Lease Agreement, Metro was required, at its own cost

and expense, to procure and maintain commercial liability insurance, railroad protection

insurance, liability insurance, worker's compensation and employer's liability insurance, and

umbrella or excess policies, in the event lessee utilizes umbrella and excess policies .... (Doc.

No. 64, Ex. C).   Further, Exhibit C of the Lease provides that "[a]ll policy(ies) required above

(excluding Workers Compensation) ... name [UP] as an additional insured." (*Id.*)  Contrary to

UP's contentions, as written, this provision cannot be read as requiring Metro to buy an umbrella

or excess policy under the Lease Agreement for UP.  Instead, the Lease Agreement merely

provides that "in the event" Metro purchases one, it shall "follow form" and "afford no less

coverage than the primary policy."  UP's argument, therefore, fails.

The Court now examines the definitions of "insured" found in the policy.  The Umbrella

policy, in relevant part, defines "insured" as follows:

> 4. Any person or organization, other than the Named Insured,
> included as an additional insured in the policies listed in the
> Schedule of Underlying Insurance but not for broader coverage
> than is available to such person or organization under such
> underlying policies.
>
> \*   \*   \*   \*
>
> 7. Any person, organization, trustee, or estate to whom you are
> obligated by a written Insured Contract to provide insurance such
> as is afforded by this policy but only with respect to:

           a. liability arising out of operations conducted by you or on
your behalf; or

           b. facilities owned or used by you.

(Doc. No. 66, Ex. B at 10.) The term "Insured Contract" means: "[a]ny oral or written contract

or agreement entered into by you and pertaining to your business under which you assume the

tort liability of another party to pay for Bodily Injury, Property Damage, Personal Injury or

Advertising Injury to a third person or organization. Tort liability means a liability that would be

imposed by law in the absence of any contract or agreement." (*Id.* at 11.) Under the policy

"you" "refers to the Named Insured" which, in this case, is Metro. (*Id.* at 7, 10.)

       For purposes of paragraph (4), while the Schedule of Underlying Insurance includes the

RPL and the Wrap-Up policy, UP was the named insured, not an additional insured, under the

RPL policy. Further, UP was not a named or additional insured under the Wrap-Up policy.[9]

Accordingly, contrary to its argument, UP would not qualify as an insured under subparagraph 4.

       Turning to paragraph (7), UP maintains that the Lease Agreement, which required Metro

to indemnify UP for tort liabilities, is an "Insured Contract" under the Umbrella policy. Lloyd's

disputes UP's contention on the basis that the Lease Agreement is invalid. Lloyd's argument is

unavailing. A concern regarding the validity of the indemnity agreement is a separate and

distinct determination from construing the scope of an "insured contract" under an insurance

policy. *Mid-Continent Cas. Co. v. Swift Energy*, 206 F.3d 487, 492-93 (5th Cir. 2000)

(construing "insured contract" broadly when carrier challenged demand for coverage); *LeBlanc*

---

[9] An issue would appear to exists as to whether, based on the Lease Agreement, Metro was required to name UP as an additional insured under the CGL. However, since this issue was not clearly raised by the parties, the Court declines to address it.

*v. Global Marine Drilling Co.*, 193 F.3d 873, 875 (5th Cir. 1999); *Certain Underwriters at Lloyd's London v. Oryx Energy Co.*, 142 F.3d 255, 258 (5th Cir. 1998); *see also, Motiva Enterprises, L.L.C. v. Liberty Mut. Ins. Co.*, 2006 WL 3246039, * 9-10 (S.D.Tex. 2006). As urged by UP, the indemnity agreement contained in the Lease Agreement is an "Insured Contract" for purposes of the Umbrella policy. Thus, under paragraph IV.E.7, UP is an "insured" under the Umbrella policy.[10]

Accordingly, Lloyd's Motion for Summary Judgment on the ground that UP is not an insured under the Umbrella policy and, thus, has no standing to bring this action is denied; and UP's Motion for Partial Summary Judgment on these grounds is granted.

### 3.  Whether Governmental Immunity Or Article XI, §7 Of The Texas Constitution Preclude This Action

Lloyd's contends, similar to Liberty Mutual's arguments, that governmental immunity (Doc. No. 66 at 6-9), and a violation of Article 11, § 7 of the Texas Constitution precludes this action. (*Id.* at 9-10.) Having addressed these issues above, the Court will not reiterate its discussion here. Lloyd's Motion for Summary Judgment on these points is denied.

### 4.  Whether the Auto Exclusion Precludes Coverage

Lloyd's, Metro and UP all seek summary judgment regarding the application of the auto exclusion. In its Motion, Lloyd's argues that UP and Metro's claims are specifically excluded because the accident arises from the use of an auto, which, by endorsement, is not covered under the policy. (Doc. No. 66 at 12-13.) In their respective Motions, Metro and UP dispute Lloyd's

---

[10] UP's coverage as an additional insured under the Umbrella policy is separate from Metro's coverage as the named insured. *See Evanston Ins. Co. v. Atofina Petrochemicals, Inc.*, 256 S.W.3d 660, 663-64 (Tex. 2008)

contention that the auto exclusion applies and argue that a Hyrail vehicle is "mobile equipment" and, thus, not excluded.  (Doc. No. 65 at 21-27; Doc. No. 69 at 13-18.)

The auto exclusion in the Umbrella policy is found in "Endorsement No. 16."  The exclusion reads: "It is understood and agreed that this Insurance does not apply to Bodily Injury or Property Damage arising out of the ownership, maintenance, operation, use, loading or unloading of any Auto."[11]  Under the policy, "auto" is defined as "a land motor vehicle, trailer or semi trailer designed for travel on public roads, including any attached machinery or equipment. But auto does not include mobile equipment." (Doc. No. 66, Ex. A, at Bates  UW/Wil00009.)

Based on the policy language, Lloyd's argues that the truck or welding truck, as referred to in various documents,[12] is a land motor vehicle and, being licensed and registered, was designed for travel on the public roads and, thus, it is clearly an "auto.".  Conversely, Metro and UP contend that the Hyrail vehicle qualifies as "mobile equipment," as defined in the policy, for two reasons.  First, Metro and UP maintain that the Hyrail vehicle falls under the policy's first definition of "mobile equipment" which broadly reads, in part:  "any of the following type of land vehicles, including any attached machinery or equipment," such as "bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads." There is, of course, no dispute that the Hyrail vehicle is a land vehicle.  Further, as urged by the parties, the operative issue is not whether the vehicle can or does travel on public roads, but whether it was

---

(recognizing difference between contractual liability coverage supporting the contractor's (named insured's) indemnity, and the coverage owed directly to Atofina as an additional insured).

[11] Unlike the CGL policy, which by its terms is limited to the operation and use of an auto by "any insured," the auto exclusion in the umbrella policy is more broadly worded and applies to the use of "any auto" regardless of insured status.

designed for use principally off public roads. *Doty v. Safeco Ins. Co.*, 400 So.2d 718, 723 (La.App. 1981) (explaining that the phrase "designed for use principally off public roads" makes clear that the determining issue is not whether the vehicle is or can be used on public roads, but the primary purpose for which the vehicle is designed or structurally suited). While Lloyd's appears to suggest that the fact the Hyrail vehicle is registered negates this interpretation, there is nothing in the policy provision that requires the vehicle not be subject to motor vehicle registration to fall within its parameter. In fact, whether the vehicle was registered and licensed to operate on the public roadways is not controlling in deciding that it was not designed for use principally off public roads. *Republic Ins. Co. v. Bolton*, 564 S.W.2d 440, 442 (Tex.Civ.App.–Dallas 1978, writ ref'd n.r.e.) (recognizing that "[t]he vehicle's susceptibility to state inspection and licensing, together with its present use as a racing vehicle, were simply evidentiary considerations bearing on the vehicle's design."). Rather, as stated, the purpose for which the vehicle's use was principally "designed" is the operative question. *See generally, Malbrough v. Wheat*, 428 So.2d 1110, 1113 (La.App. 1st Cir. 1983) (although a farm tractor may be driven on public roads, the evidence established that it was not principally designed for this purpose).

In the present case, Metro and UP offer evidence, by way of an affidavit from Jeffrey Crook, which supports their contentions that the Hyrail is "mobile equipment." (Doc. No. 67, Ex. E (Affidavit of Jeffrey Crook).) Lloyd's objects to Crook's affidavit (Doc. Nos. 72 & 73 ) on the basis that Crook lacks personal knowledge, and his affidavit is based on hearsay, conclusory opinions, and speculation. However, having considered Crook's affidavit, the Court

---

[12] In its pleadings, Lloyd's makes much of the terms that lay people use to refer to the Hyrail vehicle; however, this is not relevant when determining whether the vehicle falls within the policy's definitions.

finds that Lloyd's objections are without merit and, thus, they are overruled.  Accordingly, the competent summary judgment evidence before this Court demonstrates that the truck, modified into a Hyrail vehicle, was "designed for use principally" on the railroad tracks and, thus, off public roads.  The mere fact that the Hyrail vehicle can operate on public roads does not alter this conclusion.  *See Malbrough*, 428 So.2d at 113;

Second, Metro and UP maintain that the Hyrail vehicle falls under the policy's fourth definition of "mobile equipment" because it is a vehicle that is "maintained primarily to provide mobility to permanently mounted . . . [p]ower cranes."  Significantly, the definition does not require that the vehicle be maintained for the "sole" purpose of providing mobility to the power crane.  Instead, as provided by the very terms of the policy, the vehicle must only be maintained (not used) primarily to provide mobility to a permanently mounted power crane.  The competent evidence before the Court establishes that the Hyrail was equipped with a "telescope power crane with [a] 20-foot reach that [was] permanently mounted to the vehicle."  (Doc. No. 67, Ex. E (Affidavit of Jeffrey Crook).)  While the Hyrail had other uses, the evidence before the Court establishes that it was maintained primarily to provide mobility to the permanently mounted power crane for work done on the railroad tracks.

Not dissuaded, Lloyd's insists that the mobile equipment exception to the auto exclusion specifically provides that "self-propelled vehicles with the following types of permanently attached equipment are not mobile equipment but will be considered autos . . . welding."  However, as urged by UP, this argument is flawed.  Definition number 6, by its own terms, serves as a "catch-all" provision and applies only when the other provisions do not.  (Doc. No. 89 at 18-20.)  In addition, as written, the second phrase of Definition number 6 ("[h]owever..."),

can only be construed to modify this particular provision or paragraph, as opposed to all the preceding classes of mobile equipment.

Accordingly, having failed to establish the application of the auto exclusion, Lloyd's Motion for Summary Judgment on this ground must be denied, and both Metro's and UP's Motions for Partial Summary Judgment on this issue must be granted.

### 5. Whether Coverage Under Umbrella Policy Limited To Construction

Lloyd's argues that the Umbrella policy does not respond to the claims at issue because the construction of the test track was completed. (Doc. No. 66 at 13-15; *see also*, Doc. No. 77 at 21-22; Doc. No. 87 at 15.) Lloyd's relies upon the "Risk, Interest, Location and Limits of Liability" provision contained in the "Schedule," the "Divided Work Endorsement" found in Endorsement No. 19, and the definitions contained in Endorsement No. 1 concerning the "Project Site" and "Work." UP responds that the Umbrella policy cannot reasonably be interpreted to be limited to construction of the test track. (Doc. No. 69 at 18; *see also*, Doc. No. 89 at 20-21.)

The "Risks, Interests, Location and Limits of Liability" provision found in the "Schedule" provides the following:

> This Policy provides Umbrella Liability coverage in respect of the construction of Light Rail System - 7.5 miles with 16 stations, including (but not limited to) Downtown improvement, Transit Administration Building and Park/Ride Lots, as per wording attached hereto which is hereby declared to be incorporated in and to form an integral party of this Policy.

(Doc. No. 66, Ex. B at Bates UW/Wil 4.)

In addition, the "Divided Risk Endorsement" states that "[i]t is hereby understood and agreed that this Policy applies only to liability which arises in connection with Work, at or emanating from the Project Site." (Doc. No. 66, Ex. A at Bates 41.) Endorsement No. 1 defines "Work" as "[t]he entire completed construction or the various separately identifiable parts required to be furnished under the contract documents." (*Id.* at Bates 24.) In addition, "Project Site" means "[t]hat area described in the construction contract documents including the area available for Contractor operations, access routes, right-of-ways, and approved additional sites necessary or incidental thereto." (*Id.*) "Contractor" includes "[a]ny individual, partnership, firm or corporation which has entered into a Contract for construction with The Metropolitan Transit Authority of Harris County, Texas (Metro) to perform Work at the Project Site unless such entity is specifically excluded from the OCIP."

Based on these policy provisions, Lloyd's argues that the Umbrella policy "clearly only provides coverage with respect to construction of the listed items" and "[n]o coverage is afforded for operational use of the listed items. (Doc. No. 66 at 14.) Lloyd's interpretation of these policy provisions is too strained. Under the policy, the "Project Site" includes the test track, not only because it was the "area described in the construction contract documents" (Doc. No. 65-2, Ex. A at 2, ¶5; 7, ¶17), but also because it was the "area available for Contractor operations," which included the testing or commissioning the LRVs. In addition, as provided in the policy language, "the construction of the Light Rail System" included "the final design, manufacturing, supply, installation, testing, training, spare parts, and operations and maintenance technical support" of the LRVs was a necessary and required part of the construction of the Light Rail System. (Doc. No. 65-3, Ex.1-A at 12 of 113; *see also*, Doc. No. 65-3, Ex.1-A at 14 of 114.)

51

Finally, as broadly defined in the policy, the testing of the LRVs, which is part of the "entire completed construction or the various separately identifiable parts required to be furnished under the contract documents," clearly falls within the policy's definition of "work." Thus, because the provisions of the Umbrella policy are not limited to construction, the Court concludes that Lloyd's Motion for Summary Judgment on this ground is denied, and UP's Motion for Partial Summary Judgment on this issue is granted.

### 6. Whether Alleged Violations Of The Conditions Precedent Preclude Coverage

Metro and Lloyd's filed competing Motions for Summary Judgment regarding the issue of whether the conditions precedent to coverage under the Umbrella policy have been met. (Doc. No. 65 at 22; Doc. No. 66 at 15-16.) UP filed a response to Lloyd's Motion. (Doc. No. 81 at 11-14). The Court begins by addressing Metro's Motion.

In its Motion, Metro appears to seek a declaration that Lloyd's has waived "any challenge to Metro's averment that it 'has complied with and performed under the essential terms and elements of . . . the Lloyd's Policy and any defects in performance by Metro do not prevent the parties from accomplishing the purposes of the policies' [reference omitted], by not specifically, and with particularity, denying performance, as is required by the Federal Rules of Civil Procedure 9(c)." (Doc. No. 65 at 22.) Lloyd's responds that, contrary to Metro's assertions, when Lloyd's filed its Answer, it specifically denied Metro's performance of the conditions precedent. (Doc. No. 78 at 12.) The Court agrees. Metro's Motion for Partial Summary Judgment on the ground that Lloyd's waived compliance with the conditions precedent by failing to comply with Rule 9(c) of the Federal Rules of Civil Procedure is denied

52

Turning to the competing Motion, Lloyd's contends that coverage is precluded under the Umbrella policy on the grounds of (1) delayed notice, and (2) failure to obtain consent to settle or the "no-action" clause. (Doc. No. 66 at 15-17.) UP filed a response refuting each of Lloyd's arguments. The Court addresses each issue in turn.

### 7. Whether Delayed Notice Precludes Coverage

Lloyd's contends that the delayed notice by Metro and UP precludes coverage under the Umbrella policy. (Doc. No. 66 at 15.)[13] UP counters that Lloyd's has not established late notice and, even if they had, they have failed to show prejudice. (Doc. No. 81 at 11.)

The Umbrella policy requires Metro[14] to notify Lloyd's "as soon as practicable of an Occurrence which may result in a claim under this policy." (Doc. No. 66, Ex. B at Bates UW/Wil 20.) The policy further provides that "[i]f a claim is made or suit is brought against any Insured that is reasonably likely to involve this policy [Metro] must notify [Lloyd's] in writing as soon as practicable." (Id.) This provision of the policy was further modified by Endorsement 17, which stated "[i]t is understood and agreed that notice of Occurrence, claim or Suit shall be made in accordance with Condition F. Duties In The Event Of An Occurrence, Claim Or Suit via the following entity: 'Willis of Texas.'" (Id. at Bates UW/Wil 40.) There is no dispute that Willis of Texas had notice of the accident and UP's claims shortly after the occurrence in 2004. Thus, pursuant to the terms of the agreement, notice to Willis of Texas satisfied the terms of this condition.

_____

[13] Lloyd's complains that it did not receive timely notice of the accident or the suit and that it was given less than 24 hours to consider a settlement offer to Plaintiff McGinnis.

[14]

53

Notwithstanding this fact, under Texas law, an insured's failure to give timely notice will not defeat coverage absent a showing by the insurer that they have been prejudiced. *PAJ, Inc. v. Hanover Ins. Co.*, 243 S.W.3d 630, 636-37 (Tex. 2008); *Hernandez v. Gulf Group Lloyds*, 875 S.W.2d 691, 693 (Tex. 1994); *Hanson Prod. Co. v. Americas Ins. Co.*, 108 F.3d 627, 629-30 (5th Cir. 1997) (insurer must establish it was prejudiced by late notice). Prejudice will not be presumed from either delayed notice or "settlement without consent." *PAJ*, 243 S.W.3d at 634; *Hanson*, 108 F.3d at 631; *Comsys*, 130 S.W.3d at 191-92. Instead, an insurer "must demonstrate a material change in position to establish prejudice" and "may not disclaim coverage on the basis of prejudice that is only theoretical or presumed merely from the length of delay." *Coastal Refining & Marketing Inc. v. U.S. Fidelity & Guaranty Co.*, 218 S.W.3d 279, 288 (Tex.App.–Houston [14th Dist.] 2007, pet. denied). "Whether an insurer is prejudiced by delayed notice is generally a question of fact," but a court may determine the issue as a matter of law when the material facts are undisputed. *St. Paul Guardian Ins. Co. v. Centrum G.S. Ltd.*, 383 F.Supp.2d 891, 902 (N.D. Tex. 2003).

Willis of Texas notified Lloyd's of the loss sometime in late September 2006. There is no dispute that, in early November 2006, UP provided all the information requested by Lloyd's for the stated purpose of evaluating the coverage applicable to the accident. (*See* Doc. No. 66, Ex. C-1 at Bates W17054.) On November 28, 2006, UP communicated with Lloyd's regarding the direct settlement negotiations involving the claims made by Plaintiff McGinnis. (Doc. No. 66, Ex. C-1 at Bates W17052-54; Doc. No. 77, Ex. U.) Lloyd's did not affirm or deny coverage or tender a reservation of rights and also did not participate in the settlement negotiations or instruct either Metro or UP to refrain from settlement to allow Lloyd's to determine whether to

participate. Following several telephone discussions with Lloyd's counsel, on February 27, 2007, UP's counsel, sent a letter to Lloyd's counsel in which he provided the status of the case, demanded a defense, demanded "first-dollar liability coverage under the Lloyd's Umbrella Policy for the Incident" or, in the alternative, "without waiver, Union Pacific demands that Lloyd's provide indemnity excess to the underlying scheduled policies," and demanded Lloyd's "immediately effect a settlement of the McGinnis claim." (Doc. No. 89, Ex. A-1.) On March 13, 2007, Lloyd's denied coverage under the Umbrella policy. (*See* Doc. No. 66, Ex. C-2.) On March 22 and 23, 2007, UP emailed counsel for Liberty Mutual and Lloyd's once again requesting their participation in the settlement and also informed them of UP's intent to accept the settlement offer sought by Plaintiff McGinnis unless directed not to by either carrier. (Doc. No. 66, Ex. C-2; Doc. No. 77, Exs. Y & Z.) Without hearing from Lloyd's, on March 23, 2007, after both insurers not only declined to participate in the settlement discussions, but also declined coverage, UP settled Plaintiff McGinnis' claims. (Doc. No. 66, Ex. C-2.) On March 27, 2007, a letter from Lloyd's counsel "reiterates" their declination of coverage. (*Id.*) In the letter, although having previously declined coverage, Lloyd's objected to the increased settlement amount contemplated by UP to settle Plaintiff McGinnis' claims, complained that they did not have adequate information upon which to evaluate the reasonableness of the new settlement amount, objected that UP gave them only 24 hours to consider Plaintiff's new settlement demand, and reserved their right to contest the reasonableness of the settlement amount. (*Id.*) Notably, however, Lloyd's was notified of the suit before trial and had previously been invited to participate in the settlement discussions. Lloyd's not only declined, but denied coverage under the policy before any settlement was reached.

55

As pointed out by UP, in its Motion for Summary Judgment, Lloyd's only specific claims of prejudice are as follows:

> [it was] prejudiced by the ultimate settlement Union Pacific entered into with Plaintiff McGinnis because the original settlement agreement reached between the two was for considerably less. See Exhibit "C." For reasons unknown to Underwriters, Union Pacific failed to formalize the original settlement, allowing a significant increase in the demands of Plaintiff McGinnis, to the extreme prejudice of Underwriters.

(Doc. No. 66 at 23.) To the extent that Lloyd's suggests that its inability or failure to obtain a smaller settlement, or more favorable settlement, constitutes prejudice sufficient to relieve an insurer of its duty to defend or indemnify its insured, any such assertion would not suffice to establish prejudice. *Centrum G.S. Ltd.*, 383 F.Supp.2d at 902 (recognizing that inability to obtain a more favorable judgment is not a circumstance that will establish prejudice). Based on the evidence presented, the Court cannot conclude that Lloyd's was prejudiced as a matter of law. *See Coastal Refining & Marketing*, 218 S.W.3d at 290-92 (delayed notice to insurer of suit until less than a month before trial did not prejudice insurer where it learned of suit while defense and negotiations were still ongoing, insurer was provided access to litigation file, and insurer was invited to participate in settlement discussions). Lloyd's Motion for Summary Judgment on the ground of late notice is, therefore, denied.

### 8. Whether "No Action" Clause Precludes Coverage

Lloyd's next contends that the "no action" clause precludes coverage under the policy. (Doc. No. 66 at 16.) In particular, the Umbrella policy contains the following clause:

> There will be no right of action against us under this insurance unless:

    1. You have complied with all the terms of this policy; and

    2. The amount you owe has been determined with our consent or by
       actual trial and final judgment.

(Doc. No. 55, Ex. B at Bates UW/Wil 20.) UP responds that Lloyd's "reliance on the no-action

clause . . . is misplaced because they denied coverage." (Doc. No. 81 at 14.) While it is true

that "the insurance company may ordinarily insist upon compliance with this condition for its

own protection" (*Gulf Ins. Co. v. Parker Prods. Inc.*, 498 S.W.2d 676, 679 (Tex. 1973)), the law

is well-settled that once an insurer has breached its duty to defend, the insured is free to proceed

as he sees fit; he may engage his own counsel and either settle or litigate, at his option. *Great*

*American Indemnity Co. v. Corpus Christi*, 192 S.W.2d 917, 919 (Tex.Civ.App.-San Antonio

1946, writ ref'd n.r.e.). Having forfeited its right to conduct the defense, the insurer is bound by

the judgment or settlement. *Ridgway v. Gulf Life Insurance Co.*, 578 F.2d 1026, 1029

(judgment), *reh'g denied*, 583 F.2d 541 (5th Cir. 1978); *Ranger Insurance Co. v. Rogers*, 530

S.W.2d 162, 166-67 (Tex.Civ.App.-Austin 1975, writ ref'd n.r.e.) (settlement).

    Furthermore, another consequence of a breach of the duty to defend is the inability to

enforce against the insured any conditions in the policy; the insured is no longer constrained by

"no action" or "no voluntary assumption of liability" clauses. *Parker Products, Inc.*, 498 S.W.2d

at 679. Thus, a consequence of breach is that an insurer who wrongfully failed to defend its

insured is liable for any damages assessed against the insured, up to the policy limits, subject

only to the condition that any settlement be reasonable. *Western Alliance Ins. Co. v. Northern*

*Ins. Co. of New York*, 176 F.3d 825, 830 (5th Cir.1999). The insured must demonstrate only that,

in settling, his conduct conformed to the standard of a prudent uninsured. *Simon v. Maryland*

*Cas. Co.*, 353 F.2d 608, 612 (5th Cir. 1965) (citing *United States Auto. Ass'n v. Russom*, 241 F.2d 296, 301 (5th Cir. 1957)) (when the insurer repudiates coverage, an assured is entitled to exercise the judgment of a prudent uninsured person in compromising the claim); *Willcox v. American Home Assur. Co.*, 900 F.Supp. 850, 855-56 (S.D. Tex. 1995) (recognizing that "[w]hen an insured compromises and settles the case without the sanction of a judgment, the insured may, in a separate suit initiated against the insurer, recover the amount of damages he paid or promised to pay in settlement of the case upon sufficient proof of facts establishing that the settlement was made in good faith, upon reasonable basis, and for a reasonable amount"); *see also, Atofina Petrochemicals*, 256 S.W.3d at 677 (when an insurer wrongfully denies coverage and its insured enters into an agreed judgment, the insurer may not contest the reasonableness of the agreed judgment). Finally, when an insured settles a claim, without knowing whether or not it would be covered by the policies, this "leav[es] in place its motive to minimize the settlement amount in case it became solely responsible for payment." *Id.* at 674. Accordingly, Lloyd's Motion for Summary Judgment based on the "no-action" clause is denied.

### 9. Whether Lloyd's Breached Duty to Defend

In its Third-Party Complaint, UP alleges that Lloyd's breached its duty to defend. In its Motion for Summary Judgment, Lloyd's maintains that it had no duty to defend because the complaint alleged facts excluded by the policy. (Doc. No. 66 at 17.) The Umbrella policy, in relevant part, provides:

II. Defense

A. We shall have the right and duty to defend any claim or **suit** seeking damages covered by the terms and conditions of this policy when:

58

> 1. The applicable limits of Insurance of the underlying policies listed in the Schedule of Underlying Insurance and the limits of Insurance of any other Underlying Insurance providing coverage to the Insured have been exhausted by payment of claims to which this policy applies; or
>
> 2. Damages are sought for Bodily Injury, Property Damage, Personal Injury, or Advertising Injury covered by this policy but not covered by any underlying insurance listed in the Schedule of Underlying Insurance or any other underlying insurance providing coverage to the Insured.

(Doc. No. 66, Ex. B at Bates UW/Wil 7.)  UP maintains that it "has demonstrated that the various suits filed against it arising out of the Accident fall within the scope of coverage" (Doc. No. 69 at 9), and Lloyd's "must defend [UP] under the Umbrella policy if (i) the RPL Policy covers the claims and is exhausted by payment; or (ii) if the RPL Policy does not cover the claims." The Court agrees.  Since the Complaint's alleged facts fall within the scope of coverage and were not otherwise excluded by the policy, Lloyd's Motion for Summary Judgment on this ground is denied.

### 10. Whether UP is Entitled to Attorney's Fees
### 11. Whether No Coverage

UP maintains that it is entitled to attorney's fees under Section 38.001 of the Texas Civil Practice and Remedies Code for bringing this action against Lloyd's for breach of contract. (Doc. No. 69 at 12.)  While Lloyd's filed a response to UP's Motion, it did not address UP's argument that it is entitled to attorney's fees. (*See* Doc. Nos. 77 & 87.)

As previously discussed, in order to recover attorney's fees pursuant to Section 38.001, a party must be a prevailing party and recover actual damages on its claim. *See Mustang Pipeline Co.*, 134 S.W.3d at 201 (noting that even though the claimant had a valid claim, it "was not

entitled to recover attorney's fees because it was not awarded damages on its breach of contract claim"); *Solis*, 951 S.W.2d at 390 (where breach of contract was established, but jury awarded no damages for the breach, the party was not entitled to attorney's fees under statute). In this case, it is premature to consider UP's entitlement, if any, to attorney's fees under Section 38.001. *See Solis*, 951 S.W.2d at 390. Accordingly, UP's Motion for Partial Summary Judgment seeking attorney's fees under Section 38.001 is denied without prejudice as premature.

### 9. Whether No Coverage Under Policy Precludes Bad Faith Claim

Lloyds argues that since no coverage existed under the policy, any claim that it acted in bad faith fails. (Doc. No. 66 at 17-18.) UP responds that, while the carriers "have correctly recited Texas law on the issue," to the extent coverage exists under the policy, additional discovery would be necessary and, thus, it would be "premature for the Court to consider and rule on the viability of the extra-contractual claims." (Doc. No. 81 at 15.) Insofar as coverage exists under the policy, the Court agrees with UP. Lloyd's Motion for Summary Judgment is denied on this point.

## VIII. CONCLUSION

For all the reasons set forth above, the following is **ORDERED** by the Court:

A.  Liberty Mutual's Motion for Summary Judgment (Doc. No. 64) is **GRANTED** as to the issue that UP is not an insured under the Wrap-Up policy, but **DENIED** as to all other relief sought within its Motion;

B.  Metro's Motion for Partial Summary Judgment (Doc. No. 65) is **GRANTED** as to the following issues: (1) liability coverage exists for Metro under the Wrap-Up policy; (2) the auto exclusion does not apply to preclude coverage for Metro

under the Wrap-Up policy; and (3) the Lease Agreement is an "insured contract" under the Wrap-Up policy, and **DENIED** as to all other relief sought within its Motion;

C.    Lloyd's Motion for Summary Judgment (Doc. No. 66) is **DENIED** in its entirety;

D.    UP's Motion for Partial Summary Judgment under the RPL Policy (Doc. No. 66) is **DENIED**; and

E.    UP's Motion for Partial Summary Judgment under the Umbrella Policy (Doc. No. 69) is **GRANTED** as to the following issues:  (1) UP is an additional insured under the Umbrella policy; (2) UP has standing to bring this action; (3) the auto exclusion does not apply to preclude coverage under the Umbrella policy; and (4) the Umbrella policy is not limited merely to construction, and **DENIED** as to all other relief sought within its Motion.

**IT IS SO ORDERED**.

SIGNED this _16th_ day of March, 2009.

_____
KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

**TO ENSURE PROPER NOTICE, EACH PARTY WHO RECEIVES THIS ORDER SHALL FORWARD A COPY OF IT TO EVERY OTHER PARTY AND AFFECTED NON-PARTY EVEN THOUGH THEY MAY HAVE BEEN SENT ONE BY THE COURT**